926 A.2d 350
IN THE MATTER OF TAMMY HERRMANN.

Argued April 5, 2007—Decided July 16, 2007.

*Lewis A. Scheindlin,* Assistant Attorney General, argued the cause for appellants, New Jersey Division of Youth and Family Services and New Jersey Department of Personnel (*Stuart Rabner,* Attorney General of New Jersey, attorney; *Michael J. Haas,* Assistant Attorney General, of counsel).

*Daniel P. McNerney,* argued the cause for respondent, Tammy Herrmann (*McNerney & McAuliffe,* attorneys).

Justice LAVECCHIA delivered the opinion of the Court.

Family Services Specialist trainee Tammy Herrmann was charged by her employer, the Division of Youth and Family Services (DYFS), with conduct unbecoming a public employee based on her actions during an investigation into an allegation of child abuse. DYFS sought to terminate her employment. Following a hearing before an administrative law judge (ALJ) in which the charge and penalty were sustained, the Merit System Board (MSB) affirmed Herrmann's dismissal. On appeal, howev-

er, the Appellate Division reversed the dismissal sanction. *In re Tammy Herrmann*, 387 *N.J.Super.* 450, 459, 904 *A.*2d 764 (2006). The panel determined that the principle of progressive discipline had vibrancy in this setting and ordered that some lesser penalty than termination be considered on remand. *Ibid.* We granted the petition for certification filed on behalf of DYFS and the Department of Personnel, 189 *N.J.* 104, 912 *A.*2d 1264 (2006), and now reverse and reinstate the penalty imposed by the MSB. Because termination was supported by the record and was neither illegal nor an unreasonable exercise of the MSB's broad discretion, *see N.J.S.A.* 11A:2-6, we defer to the agency head's penalty determination. The Appellate Division impermissibly substituted its judgment concerning the proper penalty to be applied and thereby exceeded its authority.

I.

Only the quantum of punishment, and not the sufficiency of the evidence in support of the disciplinary charge, is in issue in this appeal. Therefore, we recite the background evidence to the charge as credited by the ALJ and affirmed by the MSB.

DYFS hired Tammy Herrmann in February 2001 as a Family Services Specialist trainee. In August 2001, when she was no longer in her probationary period, she was assigned to interview the M. family regarding an allegation of child abuse.

Mr. and Mrs. M. have six adopted children, four of whom were under the age of eighteen at the time that Herrmann was assigned to look into the abuse referral. Mr. and Mrs. M. also were foster parents to a medically fragile infant, Q.T., which brought the family in regular contact with DYFS. The referral to which Herrmann was assigned concerned the family's sixth and youngest adopted child, J.M. At the time, J.M., a special needs child, was five-and-a-half-years old. Earlier in August 2001, J.M. started a small fire in family's basement. Mrs. M. discovered the fire, extinguished it before any substantial damage resulted, and immediately telephoned her husband to come home from work, which

he did. That afternoon, Mr. M. took J.M. to the local fire marshal for a fire safety lecture. Although the DYFS investigation to which Herrmann was assigned included inquiry into that fire incident, the referral came about as a result of an unrelated incident.

D.M. is a six-year-old, special needs girl who also was adopted by Mr. and Mrs. M. D.M. overheard Mr. and Mrs. M. having an angry exchange with J.M. about the fire and told her summer camp counselors about it. She also told them that her father tied up J.M.[1] The manner in which D.M. described those events led to the referral to DYFS.

On August 6, 2001, Herrmann went to the M. home to meet with the family. According to Mrs. M., Herrmann interviewed her for forty-five minutes before stating the purpose of her visit. Once she informed Mrs. M. that there had been an allegation of abuse and that she intended to interview the children individually, Mrs. M. offered her bedroom, which was air-conditioned, as a comfortable place for conducting the interviews. Mrs. M. showed her the room, specifically drawing Herrmann's attention to the presence, in the closet, of oxygen equipment used to treat D.M.'s asthma and Q.T.'s medical conditions. Herrmann talked with each of the four children in the bedroom over the next several hours. Only when Herrmann was about to leave did J.M. finally admit that he started the fire.

Herrmann's interactions with J.M. lie at the heart of this disciplinary matter. The ALJ heard divergent accounts about it from the witnesses. In the end, the ALJ credited DYFS's witnesses as credible, consistent, and believable. Conversely, he did not find Herrmann's explanation to be credible or believable.

According to Herrmann, the exchange with J.M. took place in the hallway outside the parents' bedroom. Mrs. M. testified that she believed that J.M. and Herrmann spoke in the bedroom that

---

[1] The investigation revealed that Mr. M. had tied J.M.'s seatbelt after J.M. had released himself from the restraints while Mr. M. was driving.

contained the oxygen tanks. In respect of the substance of the exchange, Herrmann said that she asked the child what kind of lighter he used to start the fire. When he did not answer, she knelt in front of him, extracted a cigarette lighter from her purse, and held it in front of his face. She testified as follows in respect of the incident.

So I said, "Well, did you light it like"—and I went to show the difference between a ball and a lighter or a click-it.

Honestly, do I know if I meant to light it at that point? I don't know. But it lit. Okay? It definitely lit. And when he saw it he went to grab at it. He—you could tell he liked it. Even though I had been holding it a second prior, until it was lit he wasn't, you know, that into it.

In her notes documenting the contact with the family, Herrmann did not record waving the lighter near J.M.'s face, nor did she immediately tell her supervisor about it. Herrmann did report to Sheryl Stafford–Curl, her supervisor, that the children should be removed from the home. Ms. Stafford–Curl testified to being skeptical about that recommendation because Herrmann tended to advocate for removal frequently. Ms. Stafford–Curl asked Herrmann to collect more information, to have a fire assessment test of J.M. performed by DYFS's independent contractor for that service, and to have the M. family sign a case management plan that restricted Mr. M.'s discipline of the children.

Accordingly, Herrmann returned to the M. home with another case worker, Elizabeth Walters. During that meeting, Herrmann told Mr. and Mrs. M. about waving the lit cigarette lighter in front of J.M.'s face and informed them that J.M.'s "fascination" with the lighter indicated that he may have a propensity to start fires. When J.M.'s parents expressed alarm that the lighter could have ignited the oxygen tanks, Herrmann, in an apparent attempt to allay their concerns, informed them that she was familiar with oxygen tanks from her prior work as a pharmacy assistant. She also chastised the parents for not keeping oxygen notification magnets on the refrigerator.

Mrs. M. testified that she was left speechless when she heard about Herrmann's dangerous action of having an open flame in

close proximity to oxygen equipment. However, although she was upset, Mrs. M. did not protest at the time because Herrmann was threatening to take her children away.[2] Mr. and Mrs. M. ultimately signed the case management plan that Herrmann had presented to them, but because they were distressed with DYFS's actions, they hired an attorney to challenge the plan. On the day that a hearing concerning the M. family's plan was scheduled to take place in Superior Court, a deputy attorney general (DAG) representing DYFS, and Herrmann's supervisor, Ms. Stafford–Curl, learned for the first time that Herrmann had waved a lit cigarette lighter in front of J.M.'s face. The newly revealed information was problematic to each, as they explained in their testimony.

Stafford–Curl testified that she was concerned because DYFS workers are not qualified by training or experience to conduct assessments of a child's propensity to start fires. She explained that DYFS standards require such tests to be performed by the qualified, independent contractor DYFS engaged specifically for that purpose. She also stated that she believed Herrmann's conduct, in attempting to perform an assessment of J.M. using a lit cigarette lighter, was inappropriate and dangerous due to the proximity of oxygen tanks.

The DAG set forth a different perspective, one that reflected the position of a litigator confronted with new information from her prospective witness. She expressed the view that Herrmann exhibited bad judgment by holding a lighter in front of the child's face, even if the presence of oxygen tanks were not considered to be a factor adding to the dangerousness of the action. That breach of judgment by the on-site case investigator tainted her ability to be a credible witness for DYFS in the agency's protective services case. The DAG concluded that she could not allow

---

[2] During the course of Herrmann's ongoing investigation of the referral, Q.T. was removed from Mr. and Mrs. M.'s foster home. According to the record, Herrmann was involved in that removal, having informed DYFS foster care workers that Q.T. was in immediate danger while in the M. home.

Herrmann to testify before the Superior Court in the M. family's hearing. She was concerned that by revealing the worker's inappropriate conduct to a Family Part judge, Herrmann's credibility as well as the credibility of DYFS workers generally would be threatened, the judge's overall opinion of DYFS's investigatory skills could be tainted, and the State's ability to obtain relief for other children might be undermined. Ultimately, the parties settled their dispute about the family's case management plan and a consent order was executed.

As a result of the cigarette lighter incident, Herrmann was served with a Preliminary Notice and then a Final Notice of Disciplinary Action seeking her termination for conduct unbecoming a public employee, pursuant to *N.J.A.C.* 4A:2–2.3(a)(6). She appealed her removal and requested a hearing before the Office of Administrative Law.

Pursuant to *N.J.S.A.* 52:14B–10(c), an ALJ conducted a hearing and rendered an Initial Decision setting forth his recommended findings of fact and conclusions of law that determined that Herrmann had engaged in conduct unbecoming a public employee. The ALJ discounted the importance of resolving the dispute over the location of the lighter incident, finding it to be immaterial because "the fact that respondent did it at all places in serious doubt her judgment and her ability to properly perform her assigned duties." He found that Herrmann's actions were dangerous and, further, concluded that the Division had proven that Herrmann's actions undermined the public trust in and credibility of DYFS.

Although noting that principles of progressive discipline can apply in respect of the determination of the disciplinary penalty, the ALJ concluded that Herrmann's act of waving a lit lighter near a five-year-old child's face was so egregious that, notwithstanding the lack of a prior history of infractions by this relatively new employee of DYFS, the appointing authority's determination to remove her from her position was appropriate. Accordingly, the ALJ's Initial Decision recommended that DYFS's termination

of Herrmann be upheld. The MSB accepted and adopted the proposed findings and conclusions set forth in the ALJ's Initial Decision.

On Herrmann's appeal to the Appellate Division, the panel affirmed the MSB conclusion that Herrmann had committed conduct unbecoming a public employee, but vacated Herrmann's removal from her position. *In re Tammy Herrmann, supra,* 387 *N.J.Super.* at 459, 904 *A.2d* 764. According to the panel, it could not "conclude that the discharge sanction in this matter was warranted by the only charge lodged against the employee: the single instance of excessive and ill-considered conduct involving the cigarette lighter." *Id.* at 456–57, 904 *A.2d* 764. The incident "was not so evocative of personal shortcomings as to be sufficiently inconsistent with the duties of the position to warrant dismissal in the absence of any other admissible past record of employee misconduct." *Id.* at 458, 904 *A.2d* 764. Noting that discharge can be appropriate notwithstanding the lack of a prior disciplinary record when the act or acts charged are so egregious or pervasive as to merit discharge, the panel nonetheless found that Herrmann's acts did not warrant such a penalty. *Id.* at 458–59, 904 *A.2d* 764. Accordingly, the panel remanded for reconsideration of a proper sanction with the added direction that the MSB should impose a penalty "better suited to the charge that was filed and sustained." *Id.* at 459, 904 *A.2d* 764.

II.

Reduced to its essence, the issue in this appeal is whether the Appellate Division exceeded the proper scope of its review when it reversed the penalty imposed by the MSB. We start then by acknowledging the well-recognized principles of judicial review of administrative agency actions. The scope of that review is limited. *See In re Carter,* 191 *N.J.* 474, 482, 924 *A.2d* 525 (2007). An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the

record. *See Campbell v. Dep't of Civil Serv.*, 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963). Three channels of inquiry inform the appellate review function:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [*Mazza v. Bd. of Trs.*, 143 *N.J.* 22, 25, 667 *A.*2d 1052 (1995) (citing *Campbell, supra,* 39 *N.J.* at 562, 189 *A.*2d 712).]

When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field. *See In re License Issued to Zahl,* 186 *N.J.* 341, 353, 895 *A.*2d 437 (2006); *Brady v. Bd. of Review,* 152 *N.J.* 197, 210, 704 *A.*2d 547 (1997); *Greenwood v. State Police Training Ctr.,* 127 *N.J.* 500, 513, 606 *A.*2d 336 (1992). Deference controls even if the court would have reached a different result in the first instance. *See In re Taylor,* 158 *N.J.* 644, 657, 731 *A.*2d 35 (1999).

That deferential standard applies to the review of disciplinary sanctions as well. *See Knoble v. Waterfront Comm'n of N.Y. Harbor,* 67 *N.J.* 427, 431–32, 341 *A.*2d 593 (1975); *see generally* 37 *New Jersey Practice, Administrative Law and Practice,* § 328, at 333–34 (Steven L. Lefelt) (1d ed. 1988) (hereinafter Lefelt). A reviewing court should alter a sanction imposed by an administrative agency only "when necessary to bring the agency's action into conformity with its delegated authority. The Court has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency." *In re Polk,* 90 *N.J.* 550, 578, 449 *A.*2d 7 (1982); *see also* Lefelt, *supra,* at 334 (stating same and that "[a]fter reviewing the statutory authorization and the record, if the court concludes that the sanction is not illegal or unreasonable, the sanction will be affirmed"). In light of the deference owed to such determinations, when reviewing administrative sanctions, "the test . . . is 'whether such punishment is so disproportionate to the offense, in light of all the circum-

stances, as to be shocking to one's sense of fairness.' " *Polk, supra,* 90 *N.J.* at 578, 449 *A.*2d 7 (citing *Pell v. Bd. of Educ.,* 34 *N.Y.*2d 222, 233, 356 *N.Y.S.*2d 833, 313 *N.E.*2d 321 (1974)). The threshold of "shocking" the court's sense of fairness is a difficult one, not met whenever the court would have reached a different result.

With those principles as our guide, we turn to this matter to review whether the Appellate Division erred when it reversed the MSB's penalty because the panel believed that progressive discipline principles required consideration of a sanction less than termination. That question requires us to examine the principle of progressive discipline and whether it requires the imposition of a lesser, more incremental penalty for this unbecoming conduct charge.

## III.

### A.

Recently, in *In re Carter, supra,* 191 *N.J.* at 483, 924 *A.*2d 525, we traced the principle of progressive discipline back to *West New York v. Bock,* 38 *N.J.* 500, 186 *A.*2d 97 (1962). In *Bock, supra,* this Court acknowledged that discipline based in part on the consideration of past misconduct can be a factor in the determination of the appropriate penalty for present misconduct. *Id.* at 522. *Bock* involved a fireman who was dismissed from public service based on a pattern of tardiness that took into consideration the employee's prior disciplinary record. *Id.* at 503–06, 186 *A.*2d 97. We affirmed imposition of the sanction of dismissal and stated that an employee's past record can be a relevant consideration when determining the reasonableness of the penalty imposed. *Id.* at 523, 186 *A.*2d 97. Our reasoning expanded on the appropriateness of progressive discipline for certain types of employment infractions: [3]

[3] The Court in *Bock, supra,* reviewed the history of civil service law and the former Civil Service Commission (Commission) to explain the Commission's

> While a single instance may not be sufficient, numerous occurrences over a reasonably short space of time, even though sporadic, may evidence an attitude of indifference amounting to neglect of duty. Such conduct is particularly serious on the part of employees whose job is to protect the public safety and where [they] serve precise shifts to afford continuous protection.
>
> [*Id.* at 522, 186 *A.*2d 97.]

We further explained what was meant by a public employee's "past record" or "record of service:"

> We believe that ... the terms should be held to encompass an employee's reasonably recent history of promotions, commendations and the like on the one hand and, on the other, formally adjudicated disciplinary actions as well as instances of misconduct informally adjudicated, so to speak, by having been previously called to the attention of and admitted by the employee.
>
> [*Id.* at 523–24, 186 *A.*2d 97.]

*See also In re Phillips,* 117 *N.J.* 567, 581, 569 *A.*2d 807 (1990) (stating that "[a]lthough we recognize that a tribunal may not consider an employee's past record to prove a present charge, ... that past record may be considered when determining the appropriate penalty for the current offense" (internal citations omitted)); *In re Morrison,* 216 *N.J.Super.* 143, 160, 523 *A.*2d 238 (App.Div.1987) (acknowledging officer's past record admissible for penalty determination); *Twp. of Moorestown v. Armstrong,* 89 *N.J.Super.* 560, 567, 215 *A.*2d 775 (App.Div.1965) (holding past record of police officer usable only for guidance in determining appropriate penalty for present offense), *certif. denied,* 47 *N.J.* 80, 219 *A.*2d 417 (1966).

■ Since *Bock,* the concept of progressive discipline has been utilized in two ways when determining the appropriate penalty for present misconduct. First, principles of progressive discipline can support the imposition of a more severe penalty for a public employee who engages in habitual misconduct. *See, e.g., In re Hall,* 335 *N.J.Super.* 45, 46, 51, 760 *A.*2d 1148 (App.Div.2000) (reinstating town's dismissal of police officer for conduct unbecom-

---

authority to modify penalties. 38 *N.J.* at 514–20, 186 *A.*2d 97. Additionally, the Court noted "[i]nvolved are important questions under the civil service law with respect to discipline of employees in the municipal service." *Id.* at 504, 186 *A.*2d 97.

ing when MSB did not give sufficient weight to officer's previous violations).

In a classic example of such use of progressive discipline, the Appellate Division cited to an employee's history of escalating penalties when it affirmed the MSB's termination of a police officer in *In re Morrison, supra,* 216 *N.J.Super.* at 147, 160–61, 523 *A.*2d 238. Morrison had a substantial history of disciplinary suspensions over his seventeen-year career, with the most recent and weighty suspension (thirty days plus loss of twenty vacation days) occurring only three and a half years earlier. *Id.* at 160, 523 *A.*2d 238. That poor record, coupled with the most recent incident that led to charges relating to an arrest made by Morrison late one evening, was held to support the MSB's dismissal of the officer. *Id.* at 160–61, 523 *A.*2d 238. As the Appellate Division explained, although termination is not lightly imposed, it was not arbitrary, capricious, or unreasonable for the MSB to dismiss Morrison in view of his record of many prior suspensions, topped off by his latest misdeed. *Id.* at 161, 523 *A.*2d 238.

In another similar example of the use of past discipline to ratchet-up a penalty for a present offense, the Appellate Division in *State–Operated School District v. Gaines,* 309 *N.J.Super.* 327, 333, 707 *A.*2d 165 (App.Div.), *certif. denied,* 156 *N.J.* 381, 718 *A.*2d 1210 (1998), took into consideration an employee's dire record of past disciplinary infractions that had resulted in progressively stiffer penalties, when the panel supported an appointing authority's decision to remove a security guard. Gaines was removed from his position for conduct unbecoming an employee, insubordination, chronic absenteeism, theft, failure to perform, and absence without leave. *Id.* at 328–29, 707 *A.*2d 165. His position required that he maintain a valid driver's license, however, Gaines' license was suspended several times between 1992 and 1995. *Ibid.* Each time he failed to inform the district of the suspensions as he was required to do. *Ibid.* After learning of Gaines' latest license suspension, the district warned Gaines not to operate their vehicles, but he disregarded that direction and continued operating

district-owned vehicles, for which he was served with the disciplinary charges seeking his removal. *Id.* at 329–30, 707 *A*.2d 165. His past disciplinary record revealed that, during his five years of employment, he had been penalized for absenteeism, chronic lateness, absences without leave, failure to perform, neglect of duty, and insubordination. *Id.* at 330, 707 *A*.2d 165. For the current charges, however, the MSB imposed not removal, as the district sought, but rather a six-month suspension. *Id.* at 331, 707 *A*.2d 165.

In reversing, the Appellate Division stated that the MSB's decision to reduce removal to a six-month suspension was clearly mistaken on that record and "was so plainly unwarranted that the interests of justice demand intervention and correction." *Id.* at 332, 707 *A*.2d 165. Noting that the MSB failed to "give sufficient weight to Gaines' appalling disciplinary record," *id.* at 333, 707 *A*.2d 165, the court concluded that Gaines' employment records showed "habitual misconduct," "an overriding indifference to his employment responsibilities," and "suggest[ ] that rehabilitation is, at best, a very remote prospect," *ibid.* The court reasoned that "[m]anagement is high among present priorities" of the state-operated school district and that sound operations require supervisors to manage their employees. *Ibid.* (citing *State v. Funicello*, 60 *N.J.* 60, 69, 286 *A*.2d 55 (Weintraub, C.J., concurring), *cert. denied*, 408 *U.S.* 942, 92 *S.Ct.* 2849, 33 *L.Ed*.2d 766 (1972)). Further, the Appellate Division recognized that "a work force cannot be effective unless it responds to direction," *ibid.*, and that "[t]he public and, more particularly, the school children of the City of Newark deserve no less," *id.* at 334, 707 *A*.2d 165. Plainly, our case law recognizes that the existence of a dismal disciplinary record can support an appointing authority's decision to rid itself of a problematic employee based on charges that, but for the past record, ordinarily would have resulted in a lesser sanction.

The second use to which the principle of progressive discipline has been put is to mitigate the penalty for a current offense. It is in that sense that the MSB cites the principle of progressive

discipline when it downgrades a penalty for an employee who has a substantial record of employment that is largely or totally unblemished by significant disciplinary infractions. *See, e.g., In re Saniuk,* 2002 WL 32590661 (N.J. Adm.) (MSB reduced forty-five-day suspension to written reprimand because of employee's long record of public service without any major disciplinary infractions). In *Stein v. Division of Youth and Family Services,* for example, an ALJ recommended reduction of a penalty of removal for a DYFS worker who had been charged with improperly divulging confidential information, constituting conduct unbecoming a public employee, *N.J.A.C.* 4A:2–2.3(a)(6). 2003 WL 21362739 (N.J. Adm.). The ALJ found the worker's record from years of service in his position to be "more than commendable" and, in fact, "exemplary," *id.* at *6, and concluded that the employee's high performance ratings and praise from supervisors warranted a suspension instead of removal, *id.* at *7.

## B.

Although progressive discipline is a recognized and accepted principle that has currency in the MSB's sensitive task of meting out an appropriate penalty to classified employees in the public sector, that is not to say that incremental discipline is a principle that must be applied in every disciplinary setting. To the contrary, judicial decisions have recognized that progressive discipline is not a necessary consideration when reviewing an agency head's choice of penalty when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest.

Thus, progressive discipline has been bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property. *See, e.g., Henry v. Rahway State Prison,* 81 *N.J.* 571, 580, 410 *A.*2d 686 (1980); *Bowden v. Bayside State Prison,* 268 *N.J.Super.* 301, 306, 633 *A.*2d 577 (App.Div.

1993), *certif. denied*, 135 *N.J.* 469, 640 *A.*2d 850 (1994). In *Henry, supra*, this Court stated that falsification of a report by a prison employee could subvert order and discipline in a prison. 81 *N.J.* at 580, 410 *A.*2d 686. We concluded that the Civil Service Commission failed to adequately consider the seriousness of the charges and, therefore, held that the Commission's determination to reduce the Department of Corrections' penalty of removal to that of a ninety–day suspension was arbitrary, capricious, and unreasonable. *Ibid.*; *see also Bowden, supra*, 268 *N.J.Super.* at 306, 633 *A.*2d 577 (progressive discipline not applicable when correction officer's card playing with inmates subverted discipline at prison).

Our appellate courts also have upheld dismissal of employees, without regard to whether the employees have had substantial past disciplinary records, for engaging in conduct that is unbecoming to the position. For example, in *Division of State Police v. Jiras*, the Appellate Division affirmed a State Trooper's dismissal for an unprovoked assault on a prisoner. 305 *N.J.Super.* 476, 478, 482, 702 *A.*2d 1298 (App.Div.1997). The court determined the infraction was "so serious as to go to the heart of his capacity to function appropriately as a State [T]rooper." *Id.* at 481, 702 *A.*2d 1298. The court found no obligation to consider a range of penalties based on the employee's past record, or to insist on an incremental sanction. *Ibid.* Rather, considering the State Police's need to maintain order and discipline among its troopers, the court cited its duty not to substitute its judgment for that of the Superintendent. *Ibid.* The panel explained that

[i]n the face of these considerations, it is not fitting that we should substitute our judgment for the Superintendent's policy determination that so basic a breach of performance standards and of duty or discipline as occurred here calls for termination in the absence of special circumstances, explanation or excuse amply demonstrated by the person charged. The record supports the Superintendent's conclusion that no such showing was adequately made here, as well as his implicit determination that Jiras's conduct in the acknowledged incident bore very basically on his capacity to function as a State [T]rooper.

[*Id.* at 481–82, 702 *A.*2d 1298.]

The court concluded by emphasizing that, "[a]s a general rule, in reviewing administrative agency decisions, we accord substantial

deference to an agency head's choice of remedy or sanction, seeing it as a matter of broad discretion, ... especially where considerations of public policy are implicated." *Id.* at 482, 702 *A.*2d 1298 (citing *In re Scioscia,* 216 *N.J.Super.* 644, 660, 524 *A.*2d 855 (App.Div.), *certif. denied,* 107 *N.J.* 652, 527 *A.*2d 471 (1987)).

For similar reasons, the Appellate Division affirmed the dismissal of a police officer for infractions that went to the heart of the officer's ability to be trusted to function appropriately in his position. *Cosme v. E. Newark Twp. Comm.,* 304 *N.J.Super.* 191, 206, 698 *A.*2d 1287 (App.Div.1997), *certif. denied,* 156 *N.J.* 381, 718 *A.*2d 1210 (1998). In *Cosme,* the police chief dismissed the officer following disciplinary charges alleging eight ordinance violations. *Id.* at 194, 698 *A.*2d 1287. The violations stemmed from an unauthorized absence and included incompetence, willful disobedience of orders, neglect of duty, and conduct subversive of the "good order and discipline of the Police Department." *Ibid.* The panel acknowledged that a police officer is a "special kind of public employee" and "must present an image of personal integrity and dependability in order to have the respect of the public." *Id.* at 206, 698 *A.*2d 1287 (citing *Armstrong, supra,* 89 *N.J.Super.* at 566, 215 *A.*2d 775). Acts that subvert good order and discipline in a police department "constitute conduct so unbecoming a police officer as to warrant dismissal." *Id.* at 205–06, 698 *A.*2d 1287 (citing *City of Newark v. Massey,* 93 *N.J.Super.* 317, 322–23, 225 *A.*2d 723 (App.Div.1967)).

Finally, the Appellate Division also has found notions of progressive discipline inapplicable when disciplinary charges against a public employee have demonstrated lack of competence or unfitness for a position. *See Klusaritz v. Cape May County,* 387 *N.J.Super.* 305, 316, 318, 903 *A.*2d 1095 (App.Div.2006) (holding that accountant's incompetence warranted dismissal), *certif. denied,* 191 *N.J.* 318, 923 *A.*2d 232 (2007). In reversing the MSB's insistence on progressive discipline, contrary to the wishes of the appointing authority, the *Klusaritz* panel stated that "[t]he [MSB's] application of progressive discipline in this context is

misplaced and contrary to the public interest." *Id.* at 317, 903 A.2d 1095. The court determined that Klusaritz's prior record is "of no moment" because his lack of competence to perform the job rendered him unsuitable for the job and subject to termination by the county. *Id.* at 316, 903 A.2d 1095.

## C.

As the aforementioned cases reflect, progressive discipline is a worthy principle but it is not subject to universal application when determining a disciplined employee's quantum of discipline. This is an instance when the MSB did not apply progressive discipline. As a matter of course, we accord substantial deference to the MSB's choice of sanction. That choice is made weightier when, as in this instance, it is the penalty imposed by the appointing authority and affirmed by the ALJ. Moreover, we cannot say that the MSB's penalty is so wide of the mark as to justify this Court's substitution of its judgment.

This case implicates the public interest in that it reflects the standards of judgment, as well as performance, that DYFS expects of its workers who are sent out into the field to interact with children and families, often in crisis.[4] *See N.J.A.C.* 10:129–2.1 to –2.10 (entrusting workers to obtain and document evidence pertaining to allegations of abuse by means of interviews, safety assessments, medical assessments, and observations, and requiring workers to make decisions as to whether allegations of abuse are founded and whether actions should be referred to law enforcement); *see also Div. of Youth and Family Servs. v. B.H.*, 391 N.J.Super. 322, 328–37, 918 A.2d 63 (App.Div.2007) (detailing

---

[4] To the extent that it has been argued that progressive discipline can be circumvented in the public interest only when police officers, correctional officers, and other public safety positions are involved, we disagree. The public interest can require the bypassing of progressive discipline based on misconduct in other positions that call for discretion and judgment by public servants who exercise substantial authority over members of the public, such as DYFS workers.

duties performed by caseworkers during an abuse investigation, including family interviews, school interviews, documentation of physical signs of abuse, review of family discipline decisions, home inspections, and formulation of safety plan). When DYFS determines that an employee's conduct has so utterly rendered her devoid of the trust that DYFS must place in its field workers, then that judgment should not be lightly second-guessed. The MSB could have insisted, but chose not to apply progressive discipline as the proper penalty for Herrmann's conduct. *See N.J.S.A.* 11A:2–6 (reposing removal determination with MSB).

The MSB is the entity charged with keeping State-government-wide standards of employee performance relatively consistent in disciplinary matters. *Ibid.* The MSB agreed with DYFS and affirmed that Herrmann's conduct constituted just cause for her removal. That judgment reflects sensitivity to the public policy concerns faced by DYFS in the difficult job that it is expected to perform. The face of DYFS—to the public and others who measure its performance [5]—is that of the case workers DYFS

---

[5] It is a matter of public record that DYFS has been sued and is subject to federal court monitoring in respect of its service to the children it is responsible to protect and serve. *See Charlie H. v. Whitman,* 83 *F.Supp.*2d 476, 495, 507 (D.N.J.2000)(denying State's motion to dismiss claims against DYFS for delaying foster care placement on basis of color, race, or national origin and for denial of custodial children's substantive due process right to receive treatment and care); *K.J. v. Div. of Youth and Family Servs.,* 363 *F.Supp.*2d 728 (D.N.J.2005)(denying State's motion to dismiss violations by DYFS of § 1983, New Jersey Child Placement Bill of Rights, and New Jersey Tort Claims Act affecting foster children).

As a result of that litigation, the Legislature enacted *N.J.S.A.* 9:3A–2, creating the Department of Children and Families "to facilitate aggressive reform of the child welfare system and ensure that the reform effort is successful." *N.J.S.A.* 9:3A–2(a). Also, pursuant to settlement agreements entered into by the parties, the State has committed itself to protecting children from harm, ensuring that the child welfare system is held accountable to the public, and providing the child welfare system with "the infrastructure, resources, and policies needed to serve the best interests of the children in its care." *Charlie H. v. Corzine,* Modified Settlement Agreement, No. 99–3678, at 2–4 (July 18, 2006), *available at* http://www.state.nj.us/dcf/home/Modified_Settlement_Agreement_7_17_06.pdf. Monitoring of the State's compliance with those agreements continues to date.

sends out on its behalf. *See generally State v. P.Z.*, 152 *N.J.* 86, 97, 703 *A.*2d 901 (1997) ("DYFS caseworkers maintain frequent contact with the family, meeting to discuss family history and dynamics, and ways to remediate problems leading to abuse or neglect."). Those individuals are the people DYFS must trust to behave appropriately and to use sound judgment when making, at times, on-the-spot decisions about the families they visit. *See, e.g., Div. of Youth and Family Servs. v. M.M.*, 189 *N.J.* 261, 269, 914 *A.*2d 1265 (2007) (noting that workers quickly removed child from parents' home on learning that mother could not care for child and no alternate suitable caregiver was available); *Div. of Youth and Family Servs. v. A.W.*, 103 *N.J.* 591, 598, 512 *A.*2d 438 (1986) (describing immediate removal of child from parents' custody when workers determined that child's health was at risk). DYFS must be able to rely on a worker's demonstrated good judgment from the moment of the initial investigation until the best interests of the child have been secured.[6]

The MSB agreed that Herrmann's conduct, as proven at the hearing, divested her of the trust necessary for her position and that progressive discipline would not be appropriate in this matter. That choice was the MSB's to make and it sided with DYFS's desire to remove Herrmann from employment as a Family Services Specialist. We will not interfere with that determination, regardless of whether we, in the first instance, would have reached the same conclusion.

In conclusion, the MSB decision recognized legitimate public policy reasons for not insisting that DYFS retain an employee who, in so short a time, lost the trust of her employer. The

---

[6] Indeed, the information gathered in a worker's investigation must be submitted to the court in support of an action for parental termination or guardianship. *See N.J.S.A.* 30:4C–16. Such reports containing a worker's first-hand knowledge of the case are treated by the courts as "supply[ing] a reasonably high degree of reliability as to the accuracy of the facts contained therein." *A.W., supra,* 103 *N.J.* at 595 n. 1, 512 *A.*2d 438 (quoting *In re Guardianship of Cope,* 106 *N.J.Super.* 336, 344, 255 *A.*2d 798 (App.Div.1969)).

Appellate Division impermissibly imposed its own judgment as to the proper penalty in this matter when the MSB's penalty could not be said to be either illegal or unreasonable, let alone "shocking" any sense of fairness. Therefore, we hold that the Appellate Division's reversal of Herrmann's removal was in error.

## IV.

We reverse the Appellate Division judgment in respect of the penalty to be imposed and reinstate the MSB's penalty removing Herrmann from her position.

*For reversal and reinstatement*—Chief Justice ZAZZALI and Justices LONG, LAVECCHIA, ALBIN, WALLACE and RIVERA-SOTO—6.

*Opposed*—None.