**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1131-22

IN THE MATTER OF
ANDREW GALES,
EDNA MAHAN
CORRECTIONAL
FACILITY, DEPARTMENT
OF CORRECTIONS.

_____

Argued November 4, 2024 – Decided April 8, 2025

Before Judges Sabatino and Jacobs.

On appeal from the New Jersey Civil Service Commission, Docket Nos. 2020-980 and 2020-1951.

Michael Garcia argued the cause for appellant (Fernandez Garcia, LLC, attorneys; Michael Garcia, of counsel and on the briefs).

Gary W. Baldwin, Deputy Attorney General, argued the cause for respondents Edna Mahan Correctional Facility and New Jersey Department of Corrections (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Eric A. Zimmerman, Deputy Attorney General, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent Civil Service Commission (Steven M.

Gleeson, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Andrew Gales, a former Senior Correctional Police Officer with the New Jersey Department of Corrections (DOC), appeals from a November 2, 2022 final agency decision of the Civil Service Commission (Commission), adopting the findings and conclusion of Administrative Law Judge (ALJ) Jeffrey Rabin, who upheld the DOC's termination of Gales from his employment.  We affirm.

I.

Gales was employed by the DOC as a Housing Unit Officer (HUO) at the Edna Mahan Correctional Facility.  On August 16, 2019, he was assigned to Stowe Two North Dormitory, working a shift from 10:00 p.m. to 6:00 a.m.  DOC rules required correctional officers working Gales' shift to perform an inmate count at 11:00 p.m., 12:00 a.m., and then every half hour until 5:00 a.m. to confirm there was "flesh and movement" in each inmate's bed.  After their inmate count, HUOs were directed "to immediately call their count in to Central Control, then enter the count into [a] logbook."

During Gales' shift, an inmate, D.S., attempted to escape, leaving her bed at 3:16 a.m.  Other officers, not including Gales, apprehended D.S. and returned her to her bed at 5:15 a.m.  After the incident, the Department's Special

Investigation Division (SID) interviewed Gales to ascertain details of the attempted escape.

SID interviewed Gales, who stated that he conducted all his inmate counts that night and recorded them in the logbook. During the interview, SID showed Gales the logbook and documented he shined a flashlight at D.S. at 4:05 a.m. during an inmate count. SID concluded Gales could not have completed his inmate counts because he had been in the breakroom and "it would not have been possible for [him] to leave the breakroom . . . without being seen on camera." Further, when SID reviewed the surveillance footage, Gales "was not seen conducting his inmate counts." Instead, he was seen "hanging out in the break room."

The day after the attempted escape, Lieutenant Ricky Nester conducted a "line-up" to discuss "making sure that when [the correctional officers] are counting inmates that there [is] a physical body in the bed." At the end of the line up, as recounted by fellow Senior Correctional Police Officer Matthew Maretti before ALJ Rabin, "Gales asked [Nester] if he could talk to everybody." With permission granted, Gales told the other assembled officers, "If anybody has anything to say, to say it to his face and not post stuff on social media." Gales was irritated and "told everybody that there [was] plenty of green grass

outside the gate [of the prison]" and they could "handle things out there." He also stated he would "f**k everybody up, their mother, their father, [and] their kids." According to Maretti, Gales approached him and said "if [Maretti] had a problem with [Gales, they could] handle things . . . outside the gate."

The PNDAs

In response to Gales' alleged misconduct, the DOC issued two Preliminary Notices of Disciplinary Action (PNDA). The first PNDA, issued on October 1, 2019, related to Gales' purported failure to conduct inmate counts during his shift. The statutory charge was for "incompetency, inefficiency, or failure to perform duties" and sleeping while on duty, N.J.A.C. 4A:2-2.3(a)(1); "neglect of duty," N.J.A.C. 4A:2-2.3(a)(7); and "other sufficient cause," N.J.A.C. 4A:2-2.3(a)(12). The PNDA also charged violations of Human Resources Bulletin (HRB) 84-17, including "[n]eglect of duty, loafing, idleness or willful failure to devote attention to tasks which could result in danger to persons or property," (HRB) 84-17(B-2); sleeping while on duty, HRB 84-17(B-4); falsification: "[i]ntentional mis-statement of material fact in connection with work, employment, application, attendance, or in any record, report or other proceeding," HRB 84-17(C-8); "conduct unbecoming of an employee," HRB 84-17(C-11); "negligence in performing duty resulting in injury to persons or

damage to property," HRB 84-17(D-1); negligently contributing to an elopement or escape, HRB 84-17(D-2); "[v]iolation of administrative procedures and/or regulations involving safety and security," HRB 84-17(D-7); and "violation of a rule, regulation, policy, procedure, order, or administrative decision." HRB 84-17(E-1).

The PNDA summarized details of the incident giving rise to the charges, determining that Gales "fail[ed] to perform security checks and unit tours as dictated by policy and procedure as well as falsifying the unit logbook." It further determined that Gales "made untruthful statements concerning his actions that were contrary to the actions that were recorded on video[,] thus intentionally misleading the investigation."

The second PNDA, issued on October 16, 2019, related to the lineup incident. It charged Gales with "conduct unbecoming a public employee," N.J.A.C. 4A:2-2.3(a)(6); "other sufficient cause," N.J.A.C. 4A:2-2.3(a)(12). The PNDA also charged violations of HRB 84-17, including: falsification: intentional misstatement of material fact in connection with work, employment application, attendance, or in any record, report, investigation, or other proceeding, HRB 84-17(C-8); "conduct unbecoming an employee," HRB 84-17(C-11); "threatening, intimidating, harassing, coercing, or interfering with

5

fellow state employees on State property," HRB 84-17(C-24); and "violation of a rule, regulation, policy, procedure, order, or administrative decision." HRB 84-17(E-1).

On October 3, 2019, Gales had a Loudermill[1] hearing regarding both PNDAs. DOC found "Gales failed to carry out his duties as . . . housing unit officer . . . . [b]y failing to conduct his counts, security checks[,] and unit tours as dictated by the [DOC] policies." DOC further found that Gales' actions "resulted in the elopement and attempted escape of [i]nmate [D.S.] . . . resulting in serious injury to the inmate." DOC also found "Gales gave several false and misleading statements during the [SID] interview/investigation and in his housing unit logbook." DOC concluded Gales' actions were "unbecoming of a correctional [p]olice [o]fficer" and suspended him without pay.

---

[1] A Loudermill hearing provides an employee with an opportunity to hear and respond to the disciplinary charges prior to termination or suspension without pay. See Caldwell v. N.J. Dep't of Corr., 250 N.J. Super. 592, 613 (App. Div. 1991) (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)) (explaining that "where a public employee has a constitutionally protectible property interest in continued employment, that employee may not be terminated without first being provided with the 'opportunity to present reasons, either in person or in writing, why proposed action should not be taken . . . .'") (internal citation omitted).

The FNDAs

On October 25, 2019, the DOC issued a Final Notice of Disciplinary Action (FNDA) sustaining all charges in the first PNDA against Gales. A second FDNA was issued on January 14, 2020, sustaining all charges in the second PNDA. Both notices authorized Gales' removal from his position effective October 17, 2019.

The OAL Hearing

Gales appealed his removal to the Commission and the matter was transmitted to the Office of Administrative Law as a contested and consolidated case. On various dates in February and March 2021, the ALJ took testimony from nine witnesses called on behalf of the DOC and two witnesses called on behalf of Gales. Gales did not testify. Following submission of summation briefs, the ALJ issued a written opinion on October 5, 2022.

In his decision, the ALJ addressed each witness's testimony and viewed video footage from the facility's stationary cameras. We have carefully reviewed the record but do not recite it in detail, except to highlight those aspects pertinent to the ALJ's findings. As framed by the ALJ, the overarching issue was whether "respondent . . . had proven by a preponderance of the evidence that it acted properly in terminating [Gales'] employment as a Housing Unit

Officer." The ALJ further observed the DOC "had both the burden of persuasion and the burden of production and was required to demonstrate by a preponderance of the competent, relevant and credible evidence that [Gales] committed the charged infractions listed in the [FNDA]."

Attempted Escape and Falsified Bed Counts

The ALJ made detailed findings based on the video footage:

> At 3:41 a.m. [Gales] walked towards the front door of the housing unit, before returning to the break room at 3:43 a.m. [Gales] then left the break room at 4:05 a.m., returned to the desk at 4:07 a.m., then returned to the break room at 4:18 a.m.
>
> During none of these two-minute excursions from the break room was [Gales] seen conducting his inmate counts, nor were these two-minute excursions even at the same times that [Gales] was scheduled to perform his inmate counts. [Gales] was in the break room at 2:00 a.m., not in Wing Six performing an inmate count. [Gales] was in the break room at 2:30 a.m., at 3:00 a.m., at 3:30 a.m. and at 4:00 a.m., instead of being in Wing Six performing his inmate counts. The surveillance video would have shown [Gales] walking through the wings performing his counts, but the only time [Gales] walked towards Wing Six was at 4:05 a.m., and even then[,] he only walked to the officers' desk.

These observations were at odds with an aspect of Gales' defense. Specifically, Officer Thomas McDowell testified that Senior Correctional Officer Igor Minivich worked as the relief officer on the same shift and had

8

agreed to cover some of Gales' bed counts.   After questioning by Gales' trial counsel, the DOC attorney did not question Minivich.

Gales' counsel argued the judge should make an adverse inference against the DOC for failing to question Minivich about the incident, "because there was testimony that Minivich conducted at least one [or two] inmate count[s] that evening, based on different handwriting in [Gales'] logbook."  The ALJ declined to make a negative inference, finding:

> McDowell's testimony only established that, at a maximum, Minivich might have only done one or two of [Gales'] counts that shift.  [Gales] was required to perform counts every half-hour from midnight till end of shift at 6:00 a.m., meaning he was to perform twelve counts during that time frame.  It is irrelevant whether Minivich might have performed counts during [Gales'] official break, and irrelevant whether Minivich was questioned as to whether he performed counts on behalf of [Gales].   The issue is whether [Gales] actually conducted the counts he wrote in his logbook for 2:00 a.m., 2:30 a.m., 3:00 a.m., 3:30 a.m., 4:00 a.m., and 4:30 a.m.

Concerning this issue, the ALJ found that Gales "did not conduct his inmate counts between 2:00 a.m. and 5:00 a.m."  The judge further found that when Gales was on an extended break, D.S. "injured herself while exiting the second story window during her escape attempt and had to receive medical attention."   Thus, Gales' actions "constituted negligence in performing one's

9

duty[,] resulting in injury to persons or damage to property and negligently contributing to elopement or escape."

As penalty for his conduct, the judge determined "[t]he . . . matter [wa]s not one [suitable for] progressive discipline." Although Gales' "only past discipline consisted of attending counseling and an official reprimand," the issue was "whether [Gales'] violations . . . were so egregious as to warrant removal."

Lineup Incident

Of the witnesses called on behalf of the DOC, the ALJ found Officer Moretti's testimony credible and corroborated by another witness, Officer Roxxane Lemonies. Lemonies testified to hearing Gales threaten other officers at the lineup by saying, "Anyone with something to say on social media can say it to my face. I have the screen shots. I'll f**k up your family." Based on other eyewitnesses' testimony, the ALJ found "[t]he evidence proffered by [the DOC] showed that [Gales] made threatening comments at the end of an officers' lineup on August 17, 2019" and "stated something approximating, 'I'll f**k up your wife and kids,' and after Moretti attempted to calm Gales down, Gales got in Moretti's face."

The ALJ further found "after Lieutenant Nester told [Gales] that a lineup was not the place for those types of comments, . . . [Gales] continued to offer

10

threats to Moretti, . . . saying they could take their discussion outside, a commonly used threat that in this situation indicated that [Gales] was prepared to . . . physical[ly] fight with Moretti."

The ALJ concluded that such statements "clearly met the prohibition of threatening, intimidating, harassing, coercing, or interfering with fellow state employees on State Property, as set forth in [HSB] 84-17[(C-24).]" The ALJ also found a preponderance of the evidence in favor of sustaining the remaining charges in the second FNDA.

In determining this offense also warranted termination of employment and dismissal of Gales' appeal, the ALJ detailed his reasoning. He found Gales "falsified his timesheets and logbook entries, then lied about his entries during the official investigation," and one day later "in an apparent reaction to other officers talking about his failures leading to an escape attempt, made threats of physical violence against his fellow officers." Accordingly, the judge concluded:

> The public good would be affected by returning an officer to a position where he previously failed to perform his official duties then falsified records to cover up his violations. . . . Gales was assigned the job of monitoring the security of a wing of a correctional institution. He allowed an escape attempt to take place on his watch. Although thwarted, an escaped convict would pose a security threat to other inmates, other

11

prison officials, and the public at large. Prison safety was of paramount concern, and the failure to follow official protocols was an egregious offense. . . . Gales was held to a higher standard of conduct than other State employees, and was expected to act in a responsible manner, with honesty, integrity, and good faith. He failed to meet these standards. [Gales] was expected to follow designed protocols to ensure safety, and his failure to do so presented the public with the image of an undependable officer. There was a reason that strict discipline was important in settings such as police departments and correctional facilities, and why the failure to obey orders could not be tolerated: failure to adhere to guidelines and protocols could cause a direct threat of harm to the general public.

The Commission's Determination

On November 2, 2022, the Commission entered its Final Administrative Action. It "accepted and adopted the [f]indings of [f]act and [c]onclusion as contained in the . . . ALJ's initial decision" after "consider[ing] the record[,] . . . including a thorough review of the exceptions and reply, and . . . ma[king] an independent evaluation of the record." The Commission "f[ound] no reason to extensively comment[,] as [Gales'] filings d[id] not persuade the Commission that the ALJ's findings and conclusions, or his recommendation to uphold the removal were arbitrary, capricious or unreasonable," and the Commission "up[held] th[e actions of the ALJ] for the reasons [he] expressed."

The Commission further found that "when appropriate, the concept of progressive discipline" should apply, however, when "determining the propriety of the penalty, several factors must be considered." These factors include "the nature of . . . [Gales'] offense, the concept of progressive discipline, and the employee's prior record." However, the Commission noted "where the underlying conduct is of an egregious nature, the imposition of a penalty up to and including removal is appropriate, regardless of an individual's disciplinary history."

Moreover, "the Commission emphasize[d] that a Senior Correctional Police Officer is a law enforcement officer who, by the very nature of h[is] job duties, is held to a higher standard of conduct than other public employees." As such, the Commission found:

> even when a Correction Officer does not possess a prior disciplinary record after many unblemished years of employment, the seriousness of an offense such as in this matter may, nevertheless, warrant the penalty of removal. In this matter, notwithstanding . . . [Gales'] minor disciplinary history, the Commission agrees with the ALJ that removal is appropriate.

The Commission agreed with the ALJ that "[t]he public good would be affected by returning an officer to a position where he previously failed to perform his official duties[,] then falsified records to cover up his violations,"

13

and that Gales' "failure to follow official protocols was an egregious offense." Accordingly, the Commission determined Gales' "removal from employment [wa]s neither disproportionate to the offenses[,] [n]or shocking to the conscious," and affirmed the ALJ's decision dismissing Gales' appeal. This appeal followed.

II.

Appellate courts have "a limited role" in the review of a determination by an administrative agency and will not reverse such a judgment unless it finds the decision "to be arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole." In re Stallworth, 208 N.J. 182, 194 (2011) (alteration in original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)) (internal quotation marks omitted). "An appellate court affords a 'strong presumption of reasonableness' to an administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014).

To determine whether the Commission's final decision is arbitrary, capricious, or unreasonable, we examine the following three prongs:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;

(2) whether the record contains substantial evidence to support the findings on which the agency based its action; and

(3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Stallworth, 208 N.J. at 194 (internal quotation marks and citation omitted).]

"When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 29 (2007). This court "may not substitute its own judgment for the agency's, even though the court might have reached a different result." Stallworth, 208 N.J. at 194 (quoting In re Carter, 191 N.J. 474, 482 (2007)).

"[T]his deferential standard applies to the review of disciplinary sanctions as well[;]" thus, "when reviewing administrative sanctions, appellate courts should consider whether the punishment is so disproportionate to the offense, in light of all of the circumstances, as to be shocking to one's sense of fairness." Stallworth, 208 N.J. at 194.

## III.

Initially, Gales contends on appeal that the ALJ violated N.J.A.C. 1:1-18.1(e) by failing to render his decision within the forty-five-day statutory window. "All initial decisions shall be issued and received by the agency head no later than 45 days after the hearing is concluded unless an earlier time frame is mandated by Federal or State law." N.J.A.C. 1:1-18.1(e).

Here, Gales asserts the ALJ's decision, issued on October 5, 2022, fell outside the statutory forty-five-day period required for submission. He argues "the record closed on April 19, 2022," as the ALJ received all rebuttals by that date. Therefore, Gales claims the ALJ "should have rendered [hi]s decision no later than June 3, 2022." This assertion is belied by the record. In fact, the ALJ's decision explicitly stated, "[a]fter delays caused by the ongoing Covid-19 protocols, and a partial reconstruction of the record, the record was reopened for final submissions of summation briefs and closed on September 16, 2022." Because the record closed on September 16, and the ALJ issued his decision on October 2, just sixteen days after the record closed, the ALJ's decision was issued well within the forty-five-day requirement.

A-1131-22

Moreover, even assuming, arguendo, the record closed on April 19, 2022, Gales presented no evidence that the alleged untimely issuance prejudiced [him] in any way.

IV.

Gales advances overlapping contentions regarding several evidentiary rulings and whether respondent met its burden of proof. Gales contends: (1) respondent "solely introduced hearsay evidence without the required residuum of any competent evidence to prove the ultimate facts;" (2) the ALJ "erroneously considered . . . Gales' admission to corroborate or supply the requisite residuum of competent proof sufficient to support the disciplinary charges;" and (3) "the ALJ erroneously admitted exhibits that contained hearsay and/or were not self-authenticating without requiring the [DOC] to provide any evidentiary foundation for those exhibits."

Burden of Proof

In appeals concerning major disciplinary actions, N.J.A.C. 4A:2-2, the burden of proof rests on the appointing authority. N.J.A.C. 4A:2-1.4; see also In re Polk, 90 N.J. 550, 560 (1982) (explaining an appointing authority has the burden of establishing the truth of disciplinary charges by a preponderance of the evidence for the removal of a civil service employee).

17

Civil Service employees' rights and duties are governed by the Civil Service Act, which provides that a public employee may be subject to major discipline for various employment-related offenses. See N.J.S.A. 11A:2-6; N.J.A.C. 4A:2-2.3. Specifically, N.J.A.C. 4A:2-2.3 allows for employees to be disciplined for "conduct unbecoming a public employee" and "other sufficient cause." "Conduct unbecoming a public employee" is defined as "any conduct which adversely affects . . . morale or efficiency . . . [or] which has a tendency to destroy public respect for [public] employees and confidence in the operation of [public] services." Karins v. Atlantic City, 152 N.J. 532, 554 (1998) (quoting In re Emmons, 63 N.J. Super. 136, 140 (App. Div. 1960)).

Evidentiary Rulings

A public employer is not bound by the Rules of Evidence in the administrative proceeding, N.J.S.A. 52:14B-10(a)(1), and hearsay — subject to the ALJ's discretion — is admissible, N.J.A.C. 1:1-15.5(a), but "some legally competent evidence must exist to support each ultimate finding of fact to an extent sufficient to provide assurances of reliability and to avoid the fact or appearance of arbitrariness[.]" N.J.A.C. 1:1-15.5(b). "Hearsay may be employed to corroborate competent proof, or competent proof may be supported or given added probative force by hearsay testimony." Weston v. State, 60 N.J.

36, 51 (1972).  "But in the final analysis[,] for a court to sustain an administrative decision, which affects the substantial rights of a party, there must be a residuum of legal and competent evidence in the record to support it."  Ibid.

The ALJ addressed Gales' contention "that much of the evidence proffered by respondent was hearsay," explaining hearsay "is admissible in the [administrative proceeding under] N.J.A.C. 1:1-15.5(a), subject to there being at least a residuum of supporting evidence."  The ALJ elaborated:

> the surveillance videos corroborated any potentially hearsay statements regarding [Gales] failing to conduct his inmate counts.  Additionally, the logbook entries which did not match with what was seen on the surveillance video were business records, a hearsay exception, pursuant to N.J.R.E. 803(c)(6).  The logbook entries were made by [Gales], constituting statements by a party-opponent, which would not be excluded by the hearsay rule.  N.J.R.E. 803(b)(1).  Further, statements made by [Gales] in the SID interview would not be hearsay.

We conclude that the ALJ's interpretation and application of evidentiary principles regarding hearsay were legally sound.

Business Record Exception to Hearsay

N.J.R.E. 803(c)(6), provides:

> A statement contained in a writing . . . made at or near the time of observation by a person with actual

19

knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, . . . [is not excluded by the hearsay rule].

"The purpose of the business records exception is to broaden the area of admissibility of relevant evidence where there is necessity and sufficient guarantee of trustworthiness." Liptak v. Rite Aid, Inc., 289 N.J. Super. 199, 219 (App. Div. 1996) (internal quotation marks and citation omitted). Accordingly, to be admissible as a business record,

[f]irst, the writing must be made in the regular course of business. Second, it must be prepared within a short time of the act, condition or event being described. Finally, the source of the information and the method and circumstances of the preparation must justify allowing it into evidence.

[State v. Sweet, 195 N.J. 357, 370 (2008) (quoting State v. Matulewicz, 101 N.J. 27, 29 (1985)).]

If a record meets these requirements, testimony from a custodian of records or other qualified witness is not required as a condition for admission. See Biunno, Weissbard, and Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 803(c)(6) (2015).

Here, Gales contends the ALJ improperly admitted the logbook recording Gales' inmate counts as a business record.[2] This argument fails. As the ALJ explained, "the surveillance videos corroborated any potentially hearsay statements regarding [Gales] failing to conduct his inmate counts." Moreover, hearsay evidence is admissible in administrative proceedings "to corroborate competent proof, or competent proof may be supported or given added probative force by hearsay testimony." Weston, 60 N.J. at 51. Here, competent proof was sufficiently provided by the surveillance footage clearly showing Gales failed to timely conduct his inmate counts.

Further, the logbook was admissible under N.J.R.E. 803(c)(6), considering that the DOC rules stated officers were to complete their inmate counts and "immediately call their count in to Central Control, then enter the count into [a] logbook." The records contained in the logbook were therefore "made in the regular course of business," and "prepared within a short time of the act, condition[,] or event being described." See Sweet, 195 N.J. at 370. Moreover, the logbook and statements made by Gales during the SID interview, to the effect that he conducted his inmate counts, were admissible as they were his own statements. Gales did not deny making the entries in the logbook.

---

[2] There was no reliance on the public record exception. N.J.R.E. 803(c)(8).

Finally, the ALJ's finding that the surveillance video showed Gales failing to conduct his inmate counts was sufficient to provide "some legally competent evidence . . . [in] support [of]" the findings, thereby allowing the logbook and Gales' statement to be admitted "to corroborate competent proof . . . by hearsay testimony." See Weston, 60 N.J. at 51; N.J.A.C. 1:1-15.5(b).

Adverse Inferences

Next, Gales contends the ALJ erred by failing to draw an adverse inference against the DOC for not calling Officer Minivich to testify about the night of the attempted escape, and specifically, about which entries he made in the logbook.

In State v. Clawans, 38 N.J. 162 (1962), our Supreme Court addressed whether an adverse-inference charge should be given to a jury for failure to call a witness at trial. The Court explained "[g]enerally, failure of a party to produce before a trial tribunal proof which, it appears, would serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him." Id. at 170. However, "such an inference cannot arise except upon certain conditions . . . ." Ibid.

The Court in State v. Hill, 199 N.J. 545 (2009) also explained that "[w]hen making a determination about a Clawans charge, a court must demonstrate that

it has taken into consideration all relevant circumstances by placing, on the record, findings on each of the following[]":

> (1) that the uncalled witness is peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate relevant and critical facts in issue[;] and (4) that such testimony appears to be superior to that already utilized in respect to the fact to be proven.
>
> [Id. at 561 (alteration in original) (quoting State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985)).]

Here, Gales' argument is without merit. Minivich was, in fact, called as a witness and subject to cross-examination. While Minivich could have testified about at least one inmate count he conducted on Gales' behalf, this assertion is based on McDowell's testimony "that if Minivich had come in at the beginning of Gales' forty-minute break, he might have conducted two counts for Gales that evening." Even so, as the ALJ recognized, "[t]he issue [wa]s whether [Gales] actually conducted the counts he wrote in the logbook for 2:00 a.m., 2:30 a.m., 3:00 a.m., 3:30 a.m., 4:00 a.m., and 4:30 a.m." As stated above, the ALJ concluded "it was clear that [Gales] had not left the break room to conduct his counts" from 2:00 a.m. to 5:00 a.m. as shown by the surveillance video. Thus,

23

there has been no showing that the ALJ's decision not to draw an adverse inference against the DOC was "so wide of the mark that a manifest denial of justice resulted." See State v. Scherzer, 301 N.J. Super. 363, 424 (App. Div 1997).

Level of Punishment

Finally, Gales contends the discipline he received "was overly severe and not consistent with his disciplinary record." The Commission has broad discretion to remove employees. Herrmann, 192 N.J. at 22, 28-29 (agencies have broad discretion in deciding a disciplinary action to the extent that the action does not shock one's sense of fairness). Still, the Commission must decide whether removal is appropriate after a hearing. N.J.S.A. 11A:2-6. The Commission must follow the law and support its findings of fact with substantial evidence; its conclusion cannot be clearly unjustified by those facts. Carter, 191 N.J. at 482-83.

On appeal, we consider "whether the 'punishment is so disproportionate to the offense, in the light of all of the circumstances, as to be shocking to one's sense of fairness.'" Stallworth, 208 N.J. at 195 (quoting Carter, 191 N.J. at 484). A court may "alter a sanction imposed by an administrative agency only 'when necessary to bring the agency's action into conformity with its delegated

authority. The [c]ourt has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency.'" Herrmann, 192 N.J. at 28 (quoting Polk, 90 N.J. at 578). Our Supreme Court has "cautioned, courts should take care not to substitute their own views of whether a particular penalty is correct for those of the body charged with making that decision." Carter, 191 N.J. at 486.

Where appropriate, the Commission utilizes progressive discipline. West New York v. Bock, 38 N.J. 500, 526-27 (1962). Generally, the severity of a public employee's discipline should increase incrementally. Herrmann, 192 N.J. at 33. However, progressive discipline can be inappropriate if "the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when [its] application . . . would be contrary to the public interest." Ibid. It is well settled that the theory of progressive discipline is not a "fixed and immutable rule" to be followed. Carter, 191 N.J. at 484.

Here, the ALJ found, and the Commission agreed, "[this] . . . matter [wa]s not one of progressive discipline." While the ALJ noted Gales' prior discipline consisted of "attending counseling and an official reprimand," his failure to conduct inmate counts and falsifying records allowed an inmate to escape,

sustain injury, and evade capture for approximately two hours before being apprehended.

For these reasons, the Commission agreed with the ALJ that "[t]he public good would be affected by returning an officer to a position where he previously failed to perform his official duties then falsified records to cover up his violations." Moreover, the Commission found Gales' "failure to follow official protocols was an egregious offense," as he was "held to a higher standard of conduct than other State employees, and was expected to act in a responsible manner, with honesty, integrity, and good faith."

In view of this, we hold the decision to forego progressive discipline and impose termination is not "shocking to one's sense of fairness." Rather, it was appropriate, because Gales' "misconduct [wa]s severe," made him "unsuitable for continuation in the position," and rendered it "contrary to the public interest" for him to continue working for the DOC. See Herrmann, 192 N.J. at 33.

For these reasons, the Commission's decision to terminate Gales from his employment was neither arbitrary, capricious nor unreasonable.

To the extent that we have not addressed any arguments raised, they lack sufficient merit to warrant discussion in a written decision. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1131-22