**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1679-15T1

IN THE MATTER OF
MARK TORSIELLO,
TOWNSHIP OF NUTLEY.

_____

Submitted December 12, 2017 — Decided June 21, 2018

Before Judges Yannotti and Leone.

On appeal from the New Jersey Civil Service
Commission, Docket Nos. 2012-950 and 2013-83.

Stuart Ball, LLC, attorneys for appellant Mark
Torsiello (Charles I. Auffant, on the brief).

Piro, Zinna, Cifelli, Paris & Genitempo,
attorneys for respondent Township of Nutley
(Alan Genitempo, of counsel and on the brief).

Christopher S. Porrino, Attorney General,
attorney for respondent New Jersey Civil
Service Commission (Brian M. Kerr, Deputy
Attorney General, on the statement in lieu of
brief).

PER CURIAM

Appellant Mark Torsiello challenges the November 5, 2015

decision of the Civil Service Commission (CSC) upholding his

termination by the Township of Nutley (Township). We affirm.

The following facts were found by the Administrative Law Judge (ALJ) in her September 23, 2015 decision, and adopted by the CSC.

Torsiello was hired in 1993 by the Township as a laborer with the Department of Public Works (DPW) and later attained the title of mechanic. In 2004, the Township disciplined him for several instances of aggressive, abusive, and threatening behavior.

On August 9, 2011, Torsiello was in uniform cleaning the Township's parking lots. During his shift, he was involved in a fight with a member of the public, his neighbor Peter Pancaro.

Torsiello and Pancaro exchanged words when Torsiello was working in a lot on William Street and Pancaro was near the corner of that street and Franklin Avenue. Torsiello said words to the effect of "What did you say mother*****r?"

Pancaro continued to walk away from Torsiello. Torsiello could have resumed his work and avoided Pancaro by driving his work truck to the next location or walking there by a different route. Torsiello also could have walked away or retreated. Instead, Torsiello "instigated and initiated a confrontation with Pancaro by walking in his direction and approaching him."

Torsiello walked approximately 150 feet to confront Pancaro. Torsiello then "chest-bumped with [Pancaro] and became involved

in a physical altercation with him." Torsiello admittedly "grabbed Pancaro and drove or shoved him into the brick wall of [a] shop."

Two police cars arrived on the scene. Torsiello's direct supervisor Michael Lombardozzi also arrived. Torsiello told Lombardozzi what he had said and done. Lombardozzi reported this to DPW superintendent Michael Luzzi.

Upon receiving Luzzi's report of the incident, Joseph Scarpelli, the commissioner and director of the DPW, ordered that Torsiello be sent home and placed on immediate suspension. For reasons discussed below, the Township issued two Final Notices of Disciplinary Action (FNDA), each memorializing that the charge of conduct unbecoming had been sustained against Torsiello. The second FNDA additionally terminated Torsiello's employment. Torsiello appealed both FNDAs to the CSC, which transmitted the appeals to the Office of Administrative Law (OAL), where they were consolidated.

A nine-day OAL hearing commenced on January 9, 2014. Lombardozzi, Luzzi, and Scarpelli, testified concerning Torsiello's disciplinary history. Luzzi and Scarpelli testified about the reasons for Torsiello's suspension and termination. The ALJ credited Lombardozzi, Luzzi, and Scarpelli as "forthright and credible witnesses" who "presented detailed and candid testimony."

The ALJ concluded Torsiello engaged in "[c]onduct unbecoming a public employee." N.J.A.C. 4A:2-2.3(a)(6). The ALJ found Torsiello's unbecoming conduct was sufficiently egregious to warrant termination even without considering his disciplinary history, but also found his earlier infractions lent additional support for his termination. Thus, based on the totality of the circumstances, the ALJ agreed termination was the appropriate discipline. However, the ALJ also found that Torsiello was entitled to back pay due to procedural violations.

Torsiello appealed to the CSC. The CSC conducted a de novo review of the OAL proceedings and issued a November 5, 2015 final administrative action. The CSC adopted the ALJ's factual findings and affirmed her upholding of the Township's decision to terminate Torsiello. However, the CSC rejected the ALJ's recommendation to award Torsiello back pay, finding his suspension was proper.

Torsiello filed this appeal.

II.

We must hew to our standard of review. "Appellate courts have 'a limited role' in the review of [CSC] decisions." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). "An appellate court affords a 'strong presumption of reasonableness' to an administrative agency's exercise of its statutorily delegated

responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014) (citation omitted). "In order to reverse an agency's judgment, an appellate court must find the agency's decision to be 'arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole.'" Stallworth, 208 N.J. at 194 (quoting Henry, 81 N.J. at 579-80). Our review of the CSC's factual findings is limited to

> whether the findings made could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the opportunity of the one who heard the witnesses to judge of their credibility, and . . . with due regard also to the agency's expertise where such expertise is a pertinent factor.
>
> [Sager v. O.A. Peterson Constr. Co., 182 N.J. 156, 164 (2004) (citation omitted).]

### III.

Torsiello argues that the Township failed to prove he engaged in conduct unbecoming a public employee and that the CSC's decision was arbitrary, capricious, and unreasonable. We disagree.

Torsiello argues the factual findings of the ALJ and CSC were belied by the record. To the contrary, there was ample evidence to support the ALJ's findings that Torsiello called Pancaro a "mother*****r," instigated a confrontation by walking approximately 150 feet to Pancaro, chest-bumped him, and became

involved in a physical altercation, grabbing him and shoving him into a brick wall.

Torsiello relies on his own testimony before the ALJ. However, the ALJ found Torsiello's testimony about the altercation to be "inherently improbable and irreconcilable with, and discredited in significant respects by, his sworn prior statements before [the] unemployment [hearing officer] and other credible evidence in the record." As noted by the CSC, the ALJ "explicitly delineated her credibility findings, identifying [Torsiello]'s inconsistent statements and implausible testimony."[1]

The ALJ had ample reasons not to credit Torsiello's trial testimony. In particular, Torsiello says he was initially berated with profanity, but the ALJ found insufficient credible evidence to show what was said except that Torsiello admitted to Lombardozzi that he said to Pancaro, "What did you say, mother*****r?" Torsiello argues that he did not seek out Pancaro, but the ALJ credited the contrary testimony of Pancaro as well as Torsiello's admission to Lombardozzi that Torsiello had walked to Pancaro and chest-bumped him. The ALJ found Torsiello's claim that Pancaro walked toward him to be "irreconcilable with the consistent

---

[1] We do not have a transcript of Torsiello's testimony at his unemployment hearing. However, he admitted he testified differently at the unemployment hearing and at the OAL hearing, and the ALJ described several disparities.

testimony of witnesses," including Pancaro, whom the ALJ found to be more credible than Torsiello. The ALJ found the evidence did not demonstrate that Pancaro attacked Torsiello. Torsiello contends all he could do was ward off Pancaro's blows, but he admitted he grabbed Pancaro and pushed him against the brick wall.[2]

Torsiello also cites the police report written by responding Officer Eric Stabinski which stated that Torsiello told the officers at the scene that "Pancaro punch[ed] him in the face" after a verbal dispute. The narrative in the police report merely records that right after the altercation, both Torsiello and Pancaro claimed to have been attacked by the other man. As such, nothing in the report refutes the ALJ's findings. Torsiello also cites Stabinski's testimony that Pancaro was agitated and verbally abusive towards Torsiello after the altercation, but that does not prove Torsiello did not engage in unbecoming conduct during the altercation. Indeed, Stabinski testified that Pancaro's behavior at the scene was normal for someone who had been attacked.

Giving due regard to the ALJ's opportunity to see and hear the witnesses, we find no basis to overturn her credibility determination. Thus, there was sufficient credible evidence to

---

[2] Torsiello weighed about 200 pounds, while Pancaro weighed about 160 pounds.

support the CSC's findings concerning Torsiello's role in the confrontation.

There was also ample testimony supporting the ALJ's finding that Torsiello "knew, or reasonably should have known, that it is unbecoming conduct to engage in a physical fight with a resident on a public street, particularly when he was on duty and wearing his work uniform." Lombardozzi testified he had repeatedly warned all his workers that fighting is unacceptable and would result in termination, and that "anyone who works for [DPW] knows [that]." Luzzi testified that, regardless of what had been said, Torsiello "never should have been involved in a fight with a member of the public," and "[h]e should have walked away."

Moreover, his engagement in such conduct demonstrated a failure to use good judgment and to act in a responsible manner. Thus, as the ALJ properly found, "[i]rrespective of whatever words may have been exchanged, [Torsiello]'s actions were not warranted or justified; [Torsiello] . . . should have walked away."

Torsiello argues his conduct did not rise to the level of conduct unbecoming. The ALJ and CSC correctly ruled that it was conduct unbecoming for a public employee on duty and in uniform to call a member of the public a "mother*****r," approach him to instigate a confrontation, chest-bump him, and become involved in a physical altercation, driving him into a brick wall.

"Conduct unbecoming a public employee," N.J.A.C. 4A:2-2.3(a)(6), is an "'elastic'" phrase encompassing "'"any conduct which adversely affects . . . morale or efficiency [or] which has a tendency to destroy public respect for municipal employees and confidence in the operation of municipal services."'" Karins v. City of Atlantic City, 152 N.J. 532, 554 (1998) (citations omitted). Torsiello concedes that engaging in a fight may constitute conduct unbecoming a public employee. As the ALJ found, to allow a public employee in uniform and on duty to call a member of the public a "mother*****r," instigate a confrontation, chest-bump him, and then drive him into a wall would tend "to destroy public respect for [municipal] employees and public confidence in the operation of the [municipal] department[]." Id. at 557; see id. at 555; Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338, 362 (2013) (finding conduct unbecoming when an off-duty police officer to "became involved in a public altercation" with another off-duty officer); Hartmann v. Police Dept. of Ridgewood, 258 N.J. Super. 32, 34, 40 (App. Div. 1992) (finding conduct unbecoming when off-duty police officers engaged in a fistfight and wrestling match).

Thus, the CSC properly found Torsiello's actions were unbecoming. Under our standard of review, there is no basis for

concluding that the CSC's decision was arbitrary, capricious, or unreasonable.

## IV.

Torsiello next argues that even assuming a finding of conduct unbecoming a public employee, his termination should be reversed because the punishment contravenes the principles of progressive discipline. "The concept of progressive discipline" seeks "to promote proportionality and uniformity in the rendering of discipline of public employees." Stallworth, 208 N.J. at 195.

> "[T]he concept of progressive discipline has been utilized in two ways": (1) to "ratchet-up" or "support [the] imposition of a more severe penalty for a public employee who engages in habitual misconduct"; and (2) "to mitigate the penalty" for an employee who has a record largely unblemished by significant disciplinary infractions.
>
> [Id. at 196 (quoting In re Herrmann, 192 N.J. 19, 30-33 (2007)).]

"[P]rogressive discipline is a flexible concept, and its application depends on the totality and remoteness of the individual instances of misconduct that comprise the disciplinary record," including their number, "their comparative seriousness," and their relationship to "the present conduct." Id. at 199. Torsiello's disciplinary record shows his aggressive, abusive, and assaultive behavior toward Pancaro was preceded by several instances of misconduct involving aggressive, abusive, and

threatening behavior which were serious enough to cause him to be suspended and warned of termination.

On June 8, 2004, Torsiello was removed from the mechanics garage and reassigned to the roads department due to ongoing problems he had with Patrick Buccino, a co-worker with whom he shared an office space in the mechanics shop. That afternoon, Buccino discovered the shared office area had been vandalized, the furniture had been damaged, and a toy action figure with a rod or spike through its head had been left on Buccino's desk. Torsiello admitted causing some of the damage. Luzzi ordered Torsiello to remove his belongings. Torsiello became upset, yelled, and cursed at Luzzi.

On July 6, 2004, Torsiello cursed at Buccino in front of a DPW supervisor. Luzzi issued an official written warning to Torsiello that "[t]his behavior is unacceptable and will not be tolerated," and that "any future incidents involving threatening or using profanities at Pat Buccino or any type of insubordination will result in a three-day suspension without pay or possible termination of employment."

On October 1, 2004, Torsiello refused to clean up a spill, Lombardozzi sent him home and suspended him for three days for insubordination, and Torsiello kicked a door and cursed at Lombardozzi. Luzzi sent another written warning to Torsiello

11

which stated, "any form of insubordination will cause you a suspension without pay [and] [t]he next incident will cause possible termination of employment."

On October 12, 2004, Torsiello was suspended for eight days after he cursed at Buccino and threatened that he "would put [Buccino] down right here." Luzzi sent another written warning to Torsiello that "[t]his behavior is unacceptable and will not be tolerated" and "this is your third and final warning [and] [y]our next incident will cause you to be terminated from your position."

On November 12, 2004, Torsiello, Luzzi, and a union representative signed an agreement which noted Torsiello's history of being disciplined and suspended for "using profanity and threatening a fellow employee," and which agreed that "any further incidents of such a nature may result in [Torsiello's] discipline and/or termination."

Torsiello's assertion that the ALJ and CSC did not consider progressive discipline is incorrect. Both discussed the principles of progressive discipline and Torciello's disciplinary record in determining that termination was appropriate. The ALJ noted that Torsiello's current charge was not "an aberration in an otherwise unblemished career and that he had received counselling, warnings, and a three-day and an eight-day suspension

12

stemming in large part from incidents that implicated verbal disputes with a fellow employee, confrontational behavior, and anger management." The ALJ further observed that Torsiello has been explicitly, "repeatedly and sufficiently notified that his behavior must change, provided numerous opportunities to correct his shortcomings, and given fair warning of the consequences of failing to act in an appropriate manner."

Both the ALJ and the CSC acknowledged that Torsiello's multiple disciplinary issues occurred seven years earlier and thus were remote. However, they remained powerful evidence as they showed Torsiello repeatedly engaged in similar aggressive and violent conduct, and was repeatedly warned, suspended, and threatened with termination. As the CSC noted, Torsiello's disciplinary history gave him "ample notice that any further incidents of inappropriate behavior involving threatening or using profanities would be the basis for further disciplinary action up to and including removal," but he engaged in "similar conduct" in this more serious altercation.

Moreover, both the ALJ and the CSC gave considerable weight to "the gravity of [Torsiello]'s infraction" in the examination of the appropriate penalty to impose. The CSC noted the diminution of public trust that would result from a public employee "in his work uniform and engaged in an altercation while on duty."

A-1679-15T1

Additionally both the ALJ and CSC noted as an aggravating factor that Torsiello had the physical altercation with a member of the public. This factor was "egregious and inexcusable in nature," and made the altercation worse than Torsiello's previous workplace infractions involving a co-worker.

In any event, "neither this court nor our Supreme Court 'regard[] the theory of progressive discipline as a fixed and immutable rule to be followed without question.'" In re Restrepo, 449 N.J. Super. 409, 425 (App. Div. 2017) (quoting In re Carter, 191 N.J. 474, 484 (2007)). "[P]rogressive discipline is not a necessary consideration when reviewing an agency head's choice of penalty when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest." Herrmann, 192 N.J. at 33.

Torsiello's misconduct was conduct unbecoming his position, which justifies termination "without regard to whether the employees have had substantial past disciplinary records." Id. at 34. His misconduct was also severe, because he instigated a physical altercation with a member of the public while in uniform on duty. Moreover, he did so on a public sidewalk on a commercial street during business hours, exposing other members of the public

to the danger and disgrace arising from his misconduct. Torsiello's misconduct rendered him unsuitable to continue in his position with the Township, and made such continuation against the public interest. Scarpelli testified: "You can't have public employees fighting with residents." Luzzi testified, "you can't have a firecracker around. I got to think about the safety of everyone else."

Torsiello's misconduct was comparable to other misconduct found "sufficiently severe that dismissal is appropriate regardless of the extent of one's prior history of discipline." Carter, 191 N.J. at 486 (a police officer's sleeping on duty); Ruroede, 214 N.J. at 362-63 (finding off-duty police officer's involvement in a public altercation justified termination); see also Hermann, 192 N.J. at 25, 33-39 (a DYFS worker holding a lighter in front of a child's face); Restrepo, 449 N.J. Super. at 425 (a prison guard leaving his post for over an hour).

Courts "'accord substantial deference to an agency head's choice of remedy or sanction.'" Herrmann, 192 N.J. at 34-35. "Accordingly, when reviewing administrative sanctions, appellate courts should consider whether the 'punishment is so disproportionate to the offense, in the light of all of the circumstances, as to be shocking to one's sense of fairness.'" Stallworth, 208 N.J. at 195 (quoting Carter, 191 N.J. at 484).

15

Moreover, as our Supreme Court has "cautioned, courts should take care not to substitute their own views of whether a particular penalty is correct for those of the body charged with making that decision." Carter, 191 N.J. at 486. We find no basis to overturn the sanction selected by the ALJ and the CSC.

V.

Torsiello argues the CSC improperly overturned the ALJ's conclusion he was entitled to back pay because his suspension was procedurally deficient. However, the CSC properly rejected each of the bases for the ALJ's conclusion.

Immediate suspension without pay is permitted by statute and regulation. N.J.S.A. 11A:2-13 permits

> the immediate suspension of an employee without a hearing if the appointing authority determines that the employee is unfit for duty or is a hazard to any person if allowed to remain on the job or that an immediate suspension is necessary to maintain safety, health, order or effective direction of public services.

N.J.A.C. 4A:2-2.5(a)(1) provides:

> An employee may be suspended immediately and prior to a hearing where it is determined that the employee is unfit for duty or is a hazard to any person if permitted to remain on the job, or that an immediate suspension is necessary to maintain safety, health, order or effective direction of public services.

The ALJ found there was "insufficient evidence demonstrating that [the Township] immediately suspended [Torsiello] based upon a determination that he was unfit for duty, he was a hazard to any person if permitted to remain on the job, or that action was necessary to maintain safety, health, order or effective direction of public services[.]"

To the contrary, Lombardozzi and Luzzi testified that on the morning of August 9, after Lombardozzi spoke to Torsiello and Pancaro at the scene, Lombardozzi informed Luzzi about the incident, including that Torsiello admitted calling Pancaro "mother*****r," walked 150 feet to reach Pancaro, and chest-bumped him. Luzzi then communicated that information to Scarpelli. Luzzi further testified that he reviewed Torsiello's personnel file "[b]ecause there was a previous episode that Mr. Torsiello was involved in back in 2004," as well as "some disciplinary actions." Luzzi reported those incidents to Scarpelli, who decided to immediately place Torsiello on suspension without pay. Scarpelli testified that he "was worried about [Torsiello] being a danger because of his past history and this incident." Thus, there was credible evidence in the record that before placing Torsiello on immediate suspension, the Township determined "that [Torsiello] was unfit for duty, he was a hazard to any person if permitted to remain on the job, or that action was necessary to maintain safety,

17

health, order or effective direction of public services." N.J.S.A. 11A:2-13. As the CSC found, there was ample evidence to support that determination.

The ALJ also found that there was insufficient evidence that the Township had "apprised [Torsiello] either orally or in writing, of why an immediate suspension [was] sought, the charges and general evidence in support of the charges and provided [him] with sufficient opportunity to review the charges and the evidence in order to respond to the charges." N.J.A.C. 4A:2-2.5(b). However, after placing Torsiello on immediate suspension on August 9, 2011, Luzzi sent Torsiello and his union representative a letter dated August 10, which advised that Torsiello was suspended for four days "for being involved in an altercation (street fight) with a resident while on town time," that such behavior was "conduct unbecoming a public employee," and that "[f]urther action may be taken pending an investigation." The CSC properly found that "[t]here was no doubt that [Torsiello] was well aware of the charges against him by August 10, 2011."

Torsiello contends the Township did no investigation. To the contrary, Lombardozzi investigated on the scene, and Luzzi researched Torsiello's disciplinary history. Scarpelli testified that he conducted an investigation by speaking to Torsiello's supervisors and reviewing Torsiello's personnel file, and that he

found the signed 2004 agreement in the personnel file and decided to move forward with seeking Torsiello's removal.

Torsiello and his union representative were apprised of this course of action at a meeting with Luzzi on August 12. There, as required by N.J.A.C. 4A:2-2.5(a)(1), the Township issued a Preliminary Notice of Disciplinary Action (PNDA) which listed the charges against Torsiello, the facts supporting the charges, and the Township's intention to seek his removal, and advised he was on immediate suspension effective August 16. An August 16 letter from Luzzi reiterated to Torsiello's union representative that the Township had moved forward with their plan "to terminate [Torsiello] on charges of conduct unbecoming a public employee as we discussed at our last meeting on August 12."

Under N.J.A.C. 4A:2-2.5(c), Torsiello requested a departmental hearing after receiving the PNDA. A hearing was scheduled for September 1, which complied with the requirement under N.J.A.C. 4A:2-2.5(d) that the hearing be held within thirty days of the issuance of the PNDA.

On September 1, immediately prior to the commencement of the scheduled hearing, the parties elected to enter into a settlement agreement, under which Torsiello would have avoided termination. Pursuant to the settlement agreement, the Township agreed to withdraw the August 12 PNDA subject to several conditions,

including: Torsiello would be suspended for sixty days retroactive to August 10; Torsiello would be demoted; Torsiello would have to submit to a psychological evaluation; Torsiello would undergo counseling for anger management; and, Torsiello and his union representative would execute a last chance agreement. Furthermore, the settlement agreement provided that Torsiello pled guilty to the charge of conduct unbecoming a public employee, and that he would be terminated if he violated any term of the settlement agreement or last chance agreement. On September 2, the Township issued an FNDA memorializing that charge and providing for his suspension and demotion effective September 5.

However, on September 15, Torsiello appealed the FNDA to the CSC and withdrew his consent to the settlement agreement. The Township issued a new PNDA dated, November 7, 2011, which sought Torsiello's termination effective August 16, based upon the public altercation and his failure to comply with the settlement agreement and last chance agreement. Following a disciplinary hearing, the Township issued a second FNDA on June 22, 2012.

The CSC ruled that Torsiello was properly apprised as to why his suspension was sought when he was sent home on August 9 and by Luzzi's August 10 letter. The CSC further ruled that the August 12 meeting satisfied the procedural requirements of N.J.A.C. 4A:2-

2.5(b) because Torsiello was given two days to review the charges and the opportunity to respond to them at the meeting.

The ALJ also found that "to the extent that [Torsiello]'s immediate suspension extended beyond six months, it was contrary to N.J.S.A. 11A:2-20 and N.J.A.C. 4A:2-2.4." The CSC properly rejected that conclusion because those provisions are not applicable to Torsiello's suspension pending a hearing. N.J.S.A. 11A:2-20 governs "disciplinary action" and states: "Except as provided for in N.J.S.A. 11A:2-13, an appointing authority may not impose a suspension or fine greater than six months." Ibid.; see N.J.A.C. 4A:2-2.4(a) ("No suspension or fine shall exceed six months[.]"). N.J.S.A. 11A:2-20 and N.J.A.C. 4A:2-2.4(a) only bar the imposition of more than six months of suspension "as a punishment," on the theory that "if an employee's offense, coupled with his admissible past record, is serious enough to dictate a suspension from duty for more than 6 months, it merits dismissal instead." Cosme v. Borough of E. Newark Twp. Comm., 304 N.J. Super. 191, 204 (App. Div. 1997) (quoting Town of West New York v. Bock, 38 N.J. 500, 525-26 (1962)).

Here, however, Torsiello was not issued a suspension in excess of six months as a punishment. Rather, as set forth above, he was placed on immediate suspension pending a hearing because the Township believed that he was unfit for duty and would be a hazard

21

if permitted to remain on the job until a hearing could be held. Such an immediate suspension was justified not under the penalty provisions but under N.J.S.A. 11A:2-13, which is explicitly excepted from N.J.S.A. 11A:2-20's six-month limit. He maintained that status while awaiting the disposition of his charges by the OAL, which was delayed by his decision to settle and then withdraw from the settlement. See Ensslin v. Twp. of No. Bergen, 275 N.J. Super. 352, 361 (App. Div. 1994) (finding the employee "waived his right to a hearing within thirty days of the [PNDA] when he agreed to hold the hearing 'in abeyance' pending settlement discussions."); see also Goodman v. Dep't of Corr., 367 N.J. Super. 591, 594, 597 (App. Div. 2004). Thus, his suspension complied with the governing statutes and the CSC correctly ruled that he was not entitled to back pay.

Torsiello argues the Township violated due process by failing to provide him with discovery and general evidence before the September 1 departmental hearing. However, he has not shown any violation of N.J.S.A. 11A:2-13 and N.J.A.C. 4A:2-2.5, or any reason it would entitle him to back pay. In any event, Torsiello was supplied with the PDNA and the general evidence against him prior to the September 1 hearing. Luzzi testified that he spoke with Torsiello at the August 12 meeting about the incident and the charges, that the police report was shown to Torsiello at that

meeting, and that he gave a copy of Torsiello's personnel file to Torsiello's wife at her request prior to the September 1 hearing. Further, there is no suggestion that Torsiello asked for additional discovery, or that there was additional written discovery that could have been provided. In any event, Torsiello was not prejudiced by this alleged denial of discovery because Torsiello and the Township elected to enter into a settlement agreement on the morning of September 1 before the scheduled hearing commenced and the hearing was cancelled. Thus, Torsiello had ample time to examine the evidence before his ultimate departmental hearing in January 2014, where he had another opportunity to respond. See Ensslin, 275 N.J. Super. at 361 (finding "procedural irregularities at the departmental level are considered 'cured' by a subsequent plenary hearing at the agency level").[3]

Torsiello further argues that the CSC decision contravened the deference owed to the ALJ's ruling that Torsiello should be granted back pay. He asserts that while the CSC "has the authority

---

[3] We have subsequently stated: "Ensslin only involved an inconsequential procedural delay. The Ensslin decision cannot be read to mean that any irregularity in the disciplinary process, no matter how serious, can be cured by a subsequent evidentiary hearing." O'Rourke v. City of Lambertville, 405 N.J. Super. 8, 22 (App. Div. 2008) (finding an unauthorized, biased investigation was not cured in a hearing). However, as in Ensslin, the procedural deficiencies complained about by Torsiello were inconsequential and non-prejudicial. Thus, any lack of process was cured by the hearings before the ALJ.

to reverse or modify an ALJ's decision, it may only do so if it is not supported by [] credible evidence or was otherwise arbitrary," citing N.J.S.A. 52:14B-10(c).

However, the statute states, in relevant part:

> In reviewing the decision of an administrative law judge, the agency head may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision, but shall state clearly the reasons for doing so. _The agency head may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless_ it is first determined from a review of the record that _the findings are arbitrary,_ capricious or unreasonable _or are not supported by sufficient, competent, and credible evidence_ in the record.

> [_Ibid._ (emphasis added).]

The CSC's rejection of the ALJ's recommendation that back pay be awarded to cure procedural deficiencies did not reject the ALJ's findings of fact as to issues of credibility of lay witnesses. Rather, as discussed above, the CSC rejected the ALJ's back pay recommendation because the ALJ's conclusion that the length of Torsiello's immediate suspension was prohibited by statute was erroneous, and because her conclusion that the Township failed to follow the procedure for immediately suspending Torsiello was not supported by the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1679-15T1