**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2618-20

IN THE MATTER OF CZEZRE
ADAMS, CITY OF NEWARK,
POLICE DEPARTMENT.

_____

Submitted September 13, 2022 – Decided September 19, 2022

Before Judges Geiger and Susswein.

On appeal from the New Jersey Civil Service Commission, Docket No. 2020-1661.

Fusco & Macaluso, PC, attorneys for appellant Czezre Adams (Giovanna Giampa, on the brief).

Kenyatta K. Stewart, Corporation Counsel, City of Newark, Department of Law, attorney for respondent City of Newark Police Department (Dorian Smith, Assistant Corporation Counsel, on the brief).

Matthew J. Platkin, Acting Attorney General, attorney for respondent New Jersey Civil Service Commission (Steven M. Gleeson, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Appellant Czezre Adams appeals from a final decision of the Civil Service Commission (CSC) upholding his removal from employment as a City of Newark Police Department (NPD) police officer. We affirm.

We take the following facts from the record. Adams began his employment as an NPD police officer in 2014. In May 2019, J.B.[1] contacted Adams through Adam's Twitter account. Adams directed J.B. to speak to him through his other Twitter account (the second account). Adams did not identify himself as a police officer on this second account. They agreed to meet at J.B.'s home later that evening. They engaged in a consensual sexual encounter and Adams took photographs and videos of the encounter with J.B.'s consent. The pictures and videos were then shared between the two, at J.B.'s request, on an application called WhatsApp. J.B. requested that Adams not post the videos on Twitter and Adams responded that he would not share the videos.

On June 4, 2019, J.B. saw the photographs and videos posted on Adam's second Twitter account. The posts did not include J.B.'s face but he knew it depicted him. J.B. sent Adams a message reiterating that he did not want the images posted or shared on Twitter and stated, "I expected you to respect what I asked this wasn't cool." Adams responded that he "completely forgot until I

---

[1] We refer to the victim by initials to protect his privacy. <u>See</u> <u>R.</u> 1:38-3(c)(12).

read our text" and said he deleted the posted images. J.B. then asked if Adams posted the photos or videos to OnlyFans[2] and Adams replied that he had not. J.B. asked Adams to "[p]lease delete everything from [his] phone."

In subsequent texts, J.B. explained that he was not looking to be shown engaging in such activities on Adams's social media account, but Adams responded that J.B. "came knocking at [his] door" and indicated that J.B. was the one that originally sought out Adams. J.B. testified that he broke off communication with Adams soon after.

J.B. monitored Adams's Twitter page and discovered that Adams had reposted videos of their sexual encounter. On September 12, 2019, J.B. reported Adams's page to Twitter, which responded by making the account unavailable for violating its social media policy.

On September 13, 2019, J.B. spoke with NPD Lieutenant Andy Rivera to file a Professional Standards complaint against Adams. J.B. claimed that Adams posted their sexual encounter without his permission. J.B. also contacted the Essex County Prosecutor's Office and spoke with an assistant prosecutor in the

---

[2] The Administrative Law Judge (ALJ) determined that "OnlyFans is a website where an individual creates a site, including videos, pictures, or other content. A user or subscriber would have to sign up for access and log into the website to view its full content."

Special Victims Unit. J.B. was told that his allegations would not be pursued as a criminal matter and that he could file a civil complaint against Adams.

J.B. posted on his Twitter account that he was being harassed by a police officer who had videotaped their sexual encounter and published the videos online. J.B. testified that he knew that he was being recorded when he and Adams had sex. In response to J.B.'s tweets and reporting to Newark, Adams posted a series of tweets on his original Twitter page. Adams tweeted, "[J.B.], really didn't want to go down this route but I thought the situation was dead, but clearly it's not, so . . . here we go." Another tweet read: "Your clock is ticking. I sent you my warning." Adams continued to tag J.B. publicly in threatening and discouraging messages while tweeting directly or replying to other user's comments about the feud. Adams had the final say in the back and forth by posting, "so you want to keep these lies up after I gave you fair warning? I have nothing but time today. Just because you changed your settings [so that] only those following can see your posts don't mean I don't have what I need. Yes, I'm pulling up." Finally, Adams stated: "Now we can keep this going because I have time[,] or you can do what I asked and I'll let you have the little dignity you have left to stay intact."

A-2618-20

J.B. later learned of yet another Twitter account (the third account) that also had an image of the sexual encounter between Adams and J.B. The account included a link to an OnlyFans account that used the same name as the OnlyFans account that was on Adams's Twitter account before it was deactivated. J.B. explained that OnlyFans required payment to see the videos posted on that page and he did not sign up to view them.

Specific to Adams's ownership of an OnlyFans account, Lt. Rivera explained that having such a pay-per-view account is considered a form of outside employment. Police officers are forbidden from making any profit from outside employment unless it is disclosed to the Department. Adams did not submit an outside employment form for the JustKash account linked to him. Lt. Rivera further testified that police are held to a higher standard, and that they are not supposed to profit from sexually explicit videos or similar activities.

J.B. testified that he emailed Adams on October 24, 2019, stating that he was hurt by Adams posting the video and wanted to protect his privacy. Adams denies receiving the email. When the men later spoke, J.B. reiterated that he did not want to have intimate photos and videos posted on Twitter.

The NPD issued a Preliminary Notice of Disciplinary Action (PNDA) to Adams on October 8, 2019, which charged him with violating N.J.A.C. 4A:2-

2.3(a)(6), Conduct Unbecoming a Public Employee, and the following NPD

rules and regulations:  Chapter 3:1.1, Conduct in Public and Private[3]; Chapter

4:2.6, Obscene, Immoral or Offensive Material[4]; Chapter 3:1.1, Conduct in

Public and Private[5]; Chapter 18:25, Acts of Immorality[6]; Chapter 18:28,

---

[3]  Chapter 3:1.1 states:  "Police officers in both private and public shall conduct themselves so as to avoid impugning the reputation of the Department. They shall maintain the dignity and integrity of their office through the exemplary obedience to all Rules and Regulations; the maintenance of respect for the welfare and rights of all citizens; the courteous and objective enforcement of laws without favor or prejudice, and the recognition that police service is a public trust requiring dedication to ideals and ethics of the highest degree."

[4]  Chapter 4:2.6 states:  "Except in the discharge of police duty, police officers shall not knowingly write, print, copy, distribute, transport, store, or possess any writings, records, recordings, or pictures which contain obscene, immoral, offensive, or defamatory matter."

[5]  Chapter 3:1.1 states:  "Police officers in both private and public shall conduct themselves so as to avoid impugning the reputation of the Department. They shall maintain the dignity and integrity of their office through the exemplary obedience to all Rules and Regulations; the maintenance of respect for the welfare and rights of all citizens; the courteous and objective enforcement of laws without favor or prejudice, and the recognition that police service is a public trust requiring dedication to ideals and ethics of the highest degree."

[6]  Chapter 18:25 states:  "Division members shall not commit acts of immorality, indecency or lewdness."

A-2618-20

Misconduct Generally.[7]  Adams was also charged with violating NPD General

Order 15-02.[8]

Adams pled not guilty at the November 13, 2019 departmental hearing

and waived his right to have his case heard by the NPD's trial board.  On

December 3, 2019, the NPD upheld the charges levied against Adams and issued

a Final Notice of Disciplinary Action (FNDA) terminating Adams's employment

with the NPD effective November 13, 2019.

Adams appealed his removal to the CSC.  The appeal was transferred to

the Office of Administrative Law (OAL) as a contested case and assigned to an

ALJ, who conducted a two-day hearing.  The NPD called J.B. and Lt. Rivera as

---

[7] Chapter 18:28 states:  "Any violation or offense not properly chargeable against a Department member under any other Rules of Discipline shall be charged under Rule No. 18."

[8] Order 15-02 states that in order to maintain "professionalism, honesty, and integrity," the NPD implemented "guidelines to address the conduct and the appearance of personnel, on and off duty, while utilizing social media outlets" to ensure members "use discretion in a manner to not discredit, defame, or disrespect the department."  The order defines "speech" to include photographs and videos.  The order provides that "members are not to engage or participate in speech containing obscene or sexually explicit language, images, acts, statements, or other forms of speech that ridicule, malign, disparage, or otherwise express bias against any race, religion, ethnicity, economic status, protected class, or social status of an individual."  Finally, the order requires that members not engage in "speech involving themselves . . . that would reflect behavior reasonably considered reckless or irresponsible."

A-2618-20

witnesses and Adams testified on his own behalf. Following the receipt of written submissions, the ALJ issued an initial decision on March 4, 2021, which upheld all charges except violation of NPD Rules and Regulations and Chapter 18:28 Misconduct Generally.

Four additional discipline appeals filed by Adams from major discipline issued by the NPD on November 13, 2019, were pending before the OAL. Those appeals, which involved unrelated charges, were from suspensions of fifteen days, forty-five days, ninety days, and thirty days, respectively.

The first suspension was for Adams's alleged conduct relating to a September 21, 2018 motor vehicle accident, involved identifying himself as a police officer, failure to maintain appropriate insurance, and providing false information during an investigation. The second suspension related to an October 31, 2018 incident during which Adams was rude to a 911 caller. The third suspension was for "unprofessional language with a caller and his failure to create an assistance assignment in the system" on November 25, 2018. The fourth suspension followed Adams's June 4, 2019 actions "in not following several orders and speaking in an unprofessional, profane manner."

The ALJ found J.B.'s testimony was "credible and persuasive concerning the multiple social media posts of the sexual encounter on Adams's . . . Twitter

8

account without [J.B.'s] consent and prior request not to do so." The ALJ noted that J.B. admitted that his tweet stating that he did not consent to the taping was "inaccurate," but he maintained "that he never agreed to Adams's use of their sexual pictures or videos on social media." J.B. also testified credibly that Adams's tweets suggested "physical violence" and that Adams called him on October 7, 2019, "from an unknown caller number and threatened to sue J.B."

In contrast, the ALJ found Adams's testimony "that he did not post or use the images from the sexual encounter after June 4, 2019," was not credible. The ALJ found there was a link between the second Twitter account and Adams and that he posted images of the May 30, 2019 sexual encounter on June 4 and September 12, 2019, without J.B.'s consent. "However, the evidence did not establish that the Twitter account references or depicts Adams's employment as a police officer." In addition, the ALJ noted that Adams denied creating the third Twitter account, the photo associated with that account "does not reveal Adams's face or otherwise identify Adams[,]" and the NPD presented no other information or records "connecting Adams to the account." The ALJ therefore found that the evidence did not demonstrate that the third Twitter account "belong[ed] to Adams or that he earned money by posting images or videos from the May 30, 2019 sexual encounter."

A-2618-20

The ALJ concluded "that a preponderance of the credible evidence" showed that Adams violated NPD Rules 3.1-1, 4:2-6, 18:25, and Order 15-02 "by recording and later posting sexually explicit content on his social media account without [J.B.'s] consent on more than one occasion." She found Adams's actions "reflected irresponsible behavior on social media in violation of Order 15-02" and that "Adams violated N.J.A.C. 4A:2-2.3(a)(6) because Adams's conduct is incompatible with the high degree of integrity and respect expected of all police officers." Because the violations of Rules 3.1-1, 4:2-6, and 18:25 were upheld, the ALJ concluded that "Adams did not violate 18:28 for actions or conduct not covered by other rules or regulations."

Following the receipt of additional submissions regarding progressive discipline, the ALJ considered the appropriate level of discipline. Regarding the relevance of Adams's other disciplinary appeals, the ALJ recognized Adams incurred no prior discipline in the five years preceding the charges in this case and those involved in the other four pending appeals. However, "consideration of pending disciplinary appeals is appropriate in determining the penalty here." "Further, the pending appeals note significant offenses within a short period and include a maximum suspension of ninety days." Even so, "the nature of the

offenses does not suggest a specific pattern of misconduct other than perhaps a disrespectful attitude."

While the misconduct occurred off-duty, the ALJ noted that Adams's conduct violated multiple rules, a departmental order, and a CSC regulation. In addition, Adams "showed a lack of respect for [J.B.'s] privacy and welfare." The ALJ nevertheless found the misconduct to be "mostly a private matter between two adults without sufficient evidence of a crime or direct involvement with Adams's position as a police officer."

The ALJ declined to bypass progressive discipline, found termination to be "unreasonably harsh," and reduced the penalty to a 180-day suspension. The NPD filed written exceptions to the initial decision.

The CSC "considered the ALJ's initial decision" and undertook "an independent evaluation of the record." On April 7, 2021, the CSC issued a final administrative action that adopted the findings of fact contained in the initial decision, rejected the ALJ's recommendation to modify the removal to a 180-day suspension, and upheld the removal.

The CSC recounted the charges, the ALJ's findings, and noted that its review of the appropriate penalty was de novo. The CSC decided that the "only appropriate penalty" was "removal from employment."

11

The CSC noted "that where the underlying conduct is of an egregious nature, the imposition of a penalty up to and including removal is appropriate, regardless of an individual's disciplinary history." That is so because "some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record." The CSC found that Adams's "actions are clearly sufficiently egregious to support the penalty of removal without consideration of progressive discipline."

The CSC concluded that the ALJ's comments regarding free speech were misplaced and irrelevant because J.B. did not consent to the posting of the video. It emphasized that the primary basis for the discipline was that Adams violated J.B.'s trust and right to privacy by posting the video on more than one occasion without J.B.'s consent. The CSC considered the repeated public posting of the video to be "wholly inappropriate" and "outrageous," and was exacerbated by Adams's other communications with J.B., which were deemed to be "actual or veiled threats." It found this conduct to be "the definition of conduct unbecoming a public employee[,]" and was "even more egregious" because police officers are held to a higher standard of conduct. The CSC explained that police officers are special employees tasked with enforcing and upholding the law while exercising "good judgment in [their] relationship with the public." To

12

that end, police officers "must present an image of personal integrity and dependability in order to have the respect of the public." It found that Adams "certainly violated [these] standards."

The CSC further explained that even if progressive discipline did apply, the ALJ's analysis was flawed. The ALJ found that Adams had "no prior discipline . . . in the nearly five years before the pending charges or charges in this case." The CSC disagreed, noting that Adams was hired in 2015 and had incurred four major disciplinary actions during the year preceding the current charges. Indeed, Adams was suspended for fifteen days in September 2018. He was thereafter suspended for thirty days, forty-five days, and ninety days before incurring the present charges.

In any event, the CSC concluded that "[a] [p]olice [o]fficer with four major disciplines in such a short time period cannot seriously expect that the fifth serious infraction that warrants major discipline would carry any penalty short of removal." The fact that the four prior major disciplinary actions involved dissimilar misconduct was not determinative. "More important [was] the fact that [Adams] had demonstrated a consistent pattern of misconduct that cannot be tolerated given the above standards imposed upon [p]olice [o]fficers." Therefore, even if Adams's "current infractions were not so egregious to support

removal absent the application of progressive discipline, it would find that applying that standard, removal is the only appropriate penalty."

This appeal followed. Adams raises the following arguments:

POINT ONE

THIS HONORABLE COURT SHOULD REVERSE THE CIVIL SERVICE COMMISSION'S DECISION TO NOT ADOPT THE ALJ'S DECISION AND REMOVE APPELLANT, BECAUSE THE DECISION WAS MANIFESTLY MISTAKEN, ARBITRARY, CAPRICIOUS AND UNREASONABLE, AND NOT SUPPORTED BY THE RECORD, AS APPELLANT'S CONDUCT WAS NOT EGREGIOUS ENOUGH TO WARRANT TERMINATION.

POINT TWO

THIS HONORABLE COURT SHOULD REVERSE THE CIVIL SERVICE COMMISSION'S DECISION TO NOT ADOPT THE ALJ'S DECISION AND REMOVE APPELLANT, BECAUSE THE CITY OF NEWARK FAILED TO PROVE APPELLANT'S DISCIPLINE BY PREPONDERANCE OF THE EVIDENCE IN THE UNDERLYING HEARING.

POINT THREE

THIS HONORABLE COURT SHOULD REVERSE THE CIVIL SERVICE COMMISSION'S DECISION TO NOT ADOPT THE ALJ'S DECISION AND REMOVE APPELLANT, BECAUSE THE DECISION WAS MANIFESTLY MISTAKEN, ARBITRARY, CAPRICIOUS, IN FINDING THAT EVEN IF PROGRESSIVE DISCIPLINE WAS FOLLOWED,

14

THERE WOULD BE SUFFICIENT PRIOR DISCIPLINE TO REMOVE THE APPELLANT.

When an employee appeals to the CSC from major disciplinary action, the appointing authority bears the burden of proof by a preponderance of the evidence, Atkinson v. Parsekian, 37 N.J. 143, 149 (1962).

Judicial review of final agency decisions is limited. Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (citing Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). Decisions "made by an administrative agency entrusted to apply and enforce a statutory scheme" are reviewed "under an enhanced deferential standard." E. Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev., ___ N.J. ___, ___ (2022) (slip op. at 14) (citing Hargrove v. Sleepy's, LLC, 220 N.J. 289, 301-02 (2015)). "We are bound to defer to the agency's factual findings if those conclusions are supported by the record." Id. at ___ (slip op. at 14-15) (citing Carpet Remnant Warehouse, Inc. v. Dep't of Lab., 125 N.J. 567, 587 (1991)). We will not disturb the determination of the Commission absent a showing "that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies expressed or implicit in the civil service act." Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019) (quoting Campbell v. Dep't of Civ. Serv., 39 N.J. 556, 562 (1963)). "When an

agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007). "Deference controls even if the court would have reached a different result in the first instance." Ibid.

A reviewing court is not, however, "bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue." Allstars, 234 N.J. at 158 (alteration in original) (quoting Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 302 (2011)). The party challenging the administrative action bears the burden of demonstrating that the agency's action was arbitrary, capricious, or unreasonable. Lavezzi v. State, 219 N.J. 163, 171 (2014).

Applying these principles, we affirm substantially for the reasons expressed by the CSC in its final decision. We add the following comments.

Our careful review of the record convinces us that the ALJ's credibility determinations were supported by substantial, credible evidence in the record, as were the ALJ's and CSC's determinations that Adams committed the disciplinary infractions for which his removal was sustained. The NPD satisfied its evidential burden of proving Adams committed the disciplinary infractions by a preponderance of the evidence. We are further convinced that the penalty of removal was warranted and not "so disproportionate to the offense, in light

of all the circumstances, as to be shocking to one's sense of fairness." In re Carter, 191 N.J. 474, 484 (2007) (quoting In re Polk, 90 N.J. 550, 578 (1982)).

Adams can hardly claim that the principle of progressive discipline should be applied to downgrade the penalty for his misconduct since Adams obviously did not have "a substantial record of employment that is largely or totally unblemished by significant disciplinary infractions." Herrmann, 192 N.J. at 33. Instead, his four prior major disciplinary actions during his relatively short tenure as a NPD police officer evidences "a consistent pattern of misconduct that cannot be tolerated given the . . .[standards] imposed upon [p]olice [o]fficers." The CSC correctly concluded that Adams's extensive disciplinary record militated strongly in favor of a more serious penalty, not a lesser penalty.

Moreover, the theory of progressive discipline is not "a fixed and immutable rule to be followed without question. Instead, [our Supreme Court has] recognized that some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record." Carter, 191 N.J. at 484.

The CSC found that standing alone, the present charges were sufficiently egregious to warrant removal, regardless of Adam's prior disciplinary history. We agree. Adam's repeated misconduct, coupled with his threatening statements

to J.B., fell far below the stricter standard of conduct to which police officers are held. See In re Phillips, 117 N.J. 567, 576-77 (1990) (explaining that police officers are held to a higher standard of conduct than other public employees); In re Att'y Gen. L. Enf't Directive Nos. 2002-5 & 2020-6, 465 N.J. Super. 111, 147 (App. Div. 2020) (same), aff'd as modified, 246 N.J. 462 (2021); Twp. of Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965) (stating that "a police officer is a special kind of public employee" whose "primary duty is to enforce and uphold the law" and "to exercise tact, restraint and good judgment in his relationship with the public"). This higher standard of conduct applies to police officers even when off-duty. Phillips, 117 N.J. at 577; In re Emmons, 63 N.J. Super. 136, 140 (App. Div. 1960).

The seriousness of Adams's misconduct is reflected by the Legislature's enactment of N.J.S.A. 2C:14-9(c), which prohibits knowingly

> disclos[ing] any photograph, film, videotape, recording or any other reproduction of the image, taken in violation of [N.J.S.A. 2C:14-9(b)], of: (1) another person who is engaged in an act of sexual penetration or sexual contact; (2) another person whose intimate parts are exposed; or (3) another person's undergarment-clad intimate parts, unless that person has consented to such disclosure.

Violating N.J.S.A. 2C:14-9(c) is a third-degree crime.[9] "Every police officer has an inherent duty to obey the law." State v. Stevens, 203 N.J. Super. 59, 65 (Law Div. 2010). Indeed, "[t]he obligation to obey the criminal laws of this state . . . is a responsibility imposed upon everyone in society." State v. Hupka, 407 N.J. Super. 489, 511 (App. Div. 2009), aff'd, 203 N.J. 222 (2010).

The fact that the Essex County Prosecutor's Office decided not to prosecute Adams for violating N.J.S.A. 2C:14-9 does not lessen the nature and seriousness of his misconduct. "Where the conduct of a public employee which forms the basis of disciplinary proceedings may also constitute a [crime], the absence of a conviction, whether by reason of nonprosecution or even acquittal, bars neither prosecution nor finding of guilt for misconduct in office in the disciplinary proceedings." Phillips, 117 N.J. at 575 (quoting Sabia v. City of Elizabeth, 132 N.J. Super. 6, 12 (App. Div. 1974)).

To the extent we have not specifically discussed any remaining arguments raised by Adams, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[9] We emphasize that the fact these were same sex sexual encounters has no bearing on the seriousness of the misconduct.

A-2618-20