**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1546-22

IN THE MATTER OF JILLIAN
BARON, HUDSON COUNTY,
DEPARTMENT OF
CORRECTIONS.

_____

Argued December 13, 2023 – Decided January 31, 2024

Before Judges Currier and Firko.

On appeal from the New Jersey Civil Service Commission, Docket No. 2022-2919.

Arthur J. Murray argued the cause for appellant Jillian Baron (Alterman & Associates, LLC, attorneys; Arthur J. Murray, on the brief).

Priscilla E. Savage argued the cause for respondent Hudson County, Department of Corrections (Chasan Lamparello Mallon & Cappuzzo, PC, attorneys; Cindy N. Vogelman, of counsel and on the brief; Priscilla E. Savage, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent Civil Service Commission (Brian D. Ragunan, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Appellant Jillian Baron appeals from the January 18, 2023 final agency decision by the Civil Service Commission (CSC) removing her as a Correctional Police Officer with the Hudson County Department of Corrections (HCDOC). We affirm.

I.

Baron was hired by the HCDOC in 2015 as a Correctional Officer and her job title later changed to Senior Correction Police Officer (SCPO). At the time of the hearing, Sergeant Alfredo Castro (Alfredo)[1] had been employed by the HCDOC for thirteen years. He has been married to Heidi Castro for twenty-two years, and they have two sons. Alfredo and Heidi lived separate and apart from each other from February 2020 to February 2022, but never legally separated or divorced. From 2016 until 2021, while Baron and Alfredo were both employed by the HCDOC, they were romantically involved and had twins together. In 2017, Heidi learned about Baron and Alfredo's relationship when Baron was pregnant. According to Baron, Alfredo told her he was getting divorced from Heidi.

---

[1] Parties who share a last name with other parties are referred to by their first names for ease of reference. By doing so, we intend no disrespect.

On May 9, 2021, which was Mother's Day, Alfredo went to his mother Elizabeth Castro's house to visit his family for a brunch. At 1:00 p.m., Baron arrived uninvited with the four-year-old twins. Upon arrival, the twins chanted, "Daddy's a liar." Baron sat on the couch in Elizabeth's living room and made a "snide" remark stating she did not think Alfredo would be there because he had told her that he was going to his aunt's house in New York City. Baron tried to talk to Heidi, but Heidi told her not to address her.

Alfredo tried to ignore Baron and left the room with the twins. Elizabeth told Baron to leave because she was not invited, but she refused to leave until she was "ready." Baron also replied, "Why can't Heidi leave?" Eventually, Baron went to the bedroom to get the twins and left. As she walked past the kitchen, Baron told Alfredo's and Heidi's sons, "Your father's a liar. He f***s me."

At that point, Heidi screamed at Baron, who responded by calling Heidi "a stupid b****." The twins started crying, so Alfredo's and Heidi's youngest son took them outside. Baron and Heidi's verbal argument escalated to a physical altercation when they grabbed each other's hair and clothing. Baron tried to "chest bump" Elizabeth, who was holding her hands out to prevent Baron from approaching Heidi and lead Baron out of her home. Baron is 6'2" tall, and

Elizabeth is between 5'2" and 5'3" tall. When Heidi tried to separate Baron and Elizabeth, Baron grabbed Heidi's face, twisted it, and scratched with her nails. Alfredo tried to get in between Baron and Heidi to stop the fight. Alfredo, his father, and his brother separated them and escorted Baron out of the house.

Elizabeth called the police, who took statements from everyone, photographed the injuries inflicted on all three women, and prepared an incident report. On May 10, 2021, Alfredo submitted an incident report to the HCDOC. Heidi and Elizabeth filed citizen complaints against Baron in Bogota municipal court, and Baron filed a citizen complaint against Heidi, which were all later dismissed.

On May 17, 2021, the HCDOC issued a Preliminary Notice of Disciplinary Action (PNDA) to Baron alleging insubordination, N.J.A.C. 4A:2-2.3(a)(2); conduct unbecoming an employee, N.J.A.C. 4A:2-2.3(a)(6); neglect of duty, N.J.A.C. 4A:2-2.3(7); and other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12). The PNDA did not specify the basis for the other sufficient cause violation under N.J.A.C. 4A:2-2.3(a)(12). In addition, Baron was charged with violating several HCDOC Custody Staff Rules and Regulations (2017); Section III, Paragraph F of the HCDOC Ethics Policy (2019); and sections 1, 3, 6, 7, 8, and 20 of the Discipline Section of the Hudson County Employee Handbook.

Following three days of departmental hearings, the Hearing Officer upheld the charges and Baron was removed from her position effective May 10, 2022. The HCDOC issued Baron a Final Notice of Disciplinary Action (FNDA) memorializing the Hearing Officer's decision. The FNDA noted Baron got into a physical altercation with Heidi and that during the altercation, Alfredo "attempted to get in between Heidi, his wife, and Officer Baron, the mother of his twins, to separate the two as they were entangled and hard to separate."

The FNDA listed Baron's progressive disciplinary actions "of major and minor consequences" as follows:

- June 19, 2015 A.N.P.[2] (1-day fine); November 13, 2015 A.N.P. (three-day fine); March 6, 2016 D.N.R.[3] (five-day fine).

- December 4, 2017 - December 10, 2017 - Minor disciplinary action of five-day suspension for neglect of duty and other sufficient cause.

- June 28, 2018 - Served with notice of immediate suspension because was charged with simple assault and was served with a restraining order.

- July 2, 2018 - Indefinite suspension pending outcome of disciplinary hearing, stemming from being charged with violation N.J.S.A. 2C:12-1A (1). On June 22, 2018, Officer Baron caused bodily injury to Officer

___

[2] Absent no pay.

[3] Did not report.

Alfredo Castro, during a domestic violence dispute by jumping on his back, placing him in a headlock and punching him in the face several times.

• December 13, 2018 - Officer Baron signed settlement agreement for a ninety-seven (97) working day unpaid suspension from July 2, 2018 - November 19, 2018. Officer Baron pled guilty to insubordination and other sufficient cause stemming from events that occurred on June 22, 2018, in which Officer Baron cause bodily injury to Officer Alfredo Castro during a domestic violence dispute.

• April 2, 2019 - Suspended without pay pending outcome of hearing stemming from incident that happened on March 25, 2019, in which HCDOC was informed by the Ridgefield Park Police Department that Officer Baron was involved in a domestic violence in with Sgt. Alfredo Castro (the victim) and was charged with simple assault. PNDA served on April 4, 2019.

• August 20, 2019 - Officer Baron signed settlement agreement for a ninety-nine (99) working day suspension, time served and agreed to take anger management/domestic violence training/therapy. Officer Baron pled guilty to the charge of Other Sufficient Cause detailed in the April 4, 2019 PNDA.

Baron appealed from her termination to the CSC, which referred the matter to the Office of Administrative Law as a contested case for a fair hearing. The Administrative Law Judge (ALJ) conducted a two-day hearing and considered the testimony of Alfredo, Heidi, Elizabeth, and Baron.

Alfredo testified there were no rules at HCDOC prohibiting his relationship with Baron, and they were no longer in a relationship. During the May 9, 2021 incident, Alfredo stated he and Baron were "off-duty" and "in civilian clothes." Alfredo testified about a June 22, 2018 incident with Baron when they got into a fight as she grabbed his watch. The police arrested Baron, and a complaint was filed against her in municipal court. On March 24, 2019, Alfredo stated he and Baron got into a fight over a set of keys, and he was hit in the eye with the keys. The police responded and took statements from Alfredo and Baron.

Alfredo testified that temporary restraining orders had previously been entered against both him and Baron, but no final restraining orders were ever issued. Alfredo testified he has never been disciplined by HCDOC because of his relationship with Baron. He also stated that Baron and Heidi were never on good terms. Alfredo played a recording he made a month after the incident where Baron stated that she "should have knocked the s*** out of [his] mother."

In contrast to Alfredo's testimony, Heidi testified the hostility began on Mother's Day the moment Baron showed up. When Elizabeth opened the front door, the twins entered and yelled, "Daddy's a liar." Heidi testified about the photographs taken by the police on the day of the incident depicting scratches

on her face, scratches on Elizabeth's face, and one depicting pictures of Baron's arms. Heidi explained that Baron had "harassed" her previously "with multiple phone calls and showing up outside her house and screaming [Alfredo's] and the children's names at 3:00 a.m." In addition, Heidi testified that Baron showed up to two of her older son's baseball games and "made scenes there." As a result of mediation of the municipal court matters, Heidi and Baron agreed to mutual no-contact orders.

Heidi also testified about a police report filed in 2018 based on terroristic threats made telephonically after Baron became upset when Heidi and Alfredo reconciled. Heidi described prior incidents with Baron. Heidi contacted an internal affairs investigator at HCDOC because Baron had harassed her over the phone. Heidi stated Baron would call her incessantly on some days, about forty times, with twenty to thirty minutes between the phone calls. Four years earlier, Heidi testified Baron made "terroristic threats" and "threatened to kill [her]." On cross-examination, Heidi denied ever telling Baron she would shoot her in the stomach, killing her children.

Elizabeth testified she hosted Mother's Day—May 9, 2021—at her home and only her sons Alfredo, Ambal, Jr., and their immediate families were invited, including the twins. When Baron arrived uninvited, Elizabeth stated

she began to "antagonize Heidi immediately." According to Elizabeth, Baron cursed at Alfredo's and Heidi's boys, told them she "was still having sex with their father and that he f**** inmates."

Elizabeth testified she asked Baron to leave, but she refused, and Heidi began screaming at Baron after hearing what she said to her sons. After asking her to leave a second time, Baron then "shoved" Elizabeth and a "scuffle" ensued. Elizabeth testified she pulled Baron's "pants to try and drag her out the front door" while her husband and Alfredo tried to separate them. After Baron was removed from her house, Elizabeth testified she called the police and filed charges against her. Elizabeth identified a photograph depicting scratches on her neck inflicted by Baron. On cross-examination, Elizabeth testified she has known Baron since she was three months pregnant with the twins and previously, Baron "would always call before coming to the house." Elizabeth clarified she did not have a relationship with Baron "where she would just 'drop in.'"

Baron testified she was driving to IHOP on the date at issue, stopped at Elizabeth's house to wish her a Happy Mother's Day, and tell her she was unable to purchase cards or flowers but wanted to buy Elizabeth lunch. Baron explained that one of the reasons she went to Elizabeth's house was because Alfredo had

9 A-1546-22

texted her that he was going to be at his aunt's house. Baron denied knowing there was a family gathering at Elizabeth's house that day, and she thought she and the twins were invited by Elizabeth to be there. Baron admitted, in hindsight, once she realized that Alfredo and Heidi were at Elizabeth's house, she should have left.

Prior to May 9, 2021, Baron testified she had met Heidi five to seven times. In response to a question posed by the ALJ, Baron testified as she was leaving the back room of Elizabeth's house, where she had spoken to Alfredo, he called her a "liar," pulled her hair, and said, "You [are] going to get it you c*** b****." Baron decided to stay because the twins were crying, and she did not want them to get "[riled] up." When Elizabeth told her to leave, Baron testified she began walking towards the door, turned around to ask for her twins, and Alfredo pushed her, causing Baron to fall and hit her head on the doorknob. When Baron tried to get up, her eyeglasses fell off and she felt her hair being grabbed and the back of her head getting punched.

After Baron stood up, Alfredo was standing between her and Heidi, and Heidi was punching her. Baron denied pushing Elizabeth and claimed she had to "put both of [her] forearms in front of [her] and both . . . fists above [her] head" to protect herself. Baron testified she told Elizabeth to call the police and

while waiting for them to arrive, Alfredo tried to break her cellular phone by throwing it at her car. At Baron's request, the police photographed her hand to illustrate she was not injured and did not hurt Heidi. Baron photographed her car to show the damage caused when Alfredo threw her phone against it. She also photographed the wound on her arm.

On cross-examination, Baron elaborated on her disciplinary record and testified she received a five-day suspension in December 2017 because she had inadequate legal representation. Baron stated she did not think the five-day suspension was appropriate because she was a new employee at the time and was unfamiliar with HCDOC's rules and regulations. In April 2018, police responded after Alfredo accused Baron of hitting him with a closed fist. In June 2018, Baron testified she was charged with simple assault after she accused Alfredo of throwing her to the ground, however, an Internal Affairs investigation revealed that she fell by herself "in an attempt to stage a false report of assault."

Baron testified about a PDNA that was issued in July 2018 that stated during a parenting exchange of the twins, Baron jumped on his back and put him in a headlock while punching his face. Consequently, in December 2018, as a result of the incident, Baron stated she was suspended for ninety-seven days.

11

In August 2018, Baron testified she was suspended for ninety-nine days after being charged with assault. Baron estimated the police had responded to a "domestic situation" between Alfredo and herself four or five times before May 9, 2021. She claimed to be the victim of domestic violence and later attended domestic violence survivor therapy.

Baron agreed she should have been disciplined for her conduct related to the May 9, 2021 incident but not terminated because she was not the aggressor. In light of the therapy and counseling she had completed, Baron testified she was confident this type of incident would not happen again. Baron testified she "had healed from domestic violence" and could "move on with [her] life and be a correctional officer, be a sergeant and, . . . show [her] kids a legacy." Baron stated HCDOC had used "selective discipline" to target her as a female and a victim of domestic violence. Baron denied the twins were chanting anything as they entered Elizabeth's house on the day of the incident and disagreed with Elizabeth's testimony that she only went to her house on previous occasions so Elizabeth could babysit the twins.

When Heidi saw Baron on the day of the incident, Baron testified she had no hostility towards her, but Heidi stated, "shut the f*** up, do not speak to me." Baron testified she knew Heidi didn't like her but thought she could just ignore

her. Baron testified she has not been able to carry her service weapon since August 2017 because her aunt called the police believing Baron was suicidal. Baron testified she voluntarily checked herself into a psychiatric ward, where she stayed for a few hours. Baron admitted to writing offensive Facebook posts about Alfredo being a neglectful father and sharing photographs of him in uniform with labels stating, "deadbeat father, liquor, sex, dating inmates, steroids, ego, reputation, lies," leading to a complaint being filed against her with HCDOC on August 5, 2021.

On cross-examination, Baron conceded she made the statements in the recording, but refuted Heidi's testimony that she had ever threatened to kill Baron by presenting pictures of text messages from Alfredo to Heidi. In one message, Alfredo wrote: "Heidi you threatened to kill her and the kids . . . she has that recorded. I[f] she throws that in our faces at the custody trial it [will] bite me in the a[**]." In another message, Heidi wrote: "I told her I would shoot her and she said[,] '[O]h you [are] going to kill me' and I told her I would shoot her in the leg so she could be a stay at home mom and collect benefits like she wants to."

At the close of the evidence and after considering written summations, the ALJ issued his Initial Decision on December 7, 2022, sustaining only the

conduct unbecoming an officer charge under N.J.A.C. 4A:2-2.3(a)(6). The ALJ found after Baron entered Elizabeth's house, she knew the situation could become volatile, and made "extremely poor" choices. The ALJ found Elizabeth's testimony was the most credible because it was "straightforward and believable" and not based on emotion. The ALJ found Alfredo's testimony was not credible because it was "directed at deliberately downplaying his position of conflicts with [Baron]."

Regarding the incident in question, the ALJ noted Heidi's credibility was adversely affected by the threats she made against Baron, and her account of the events that day was consistent with other witness's testimony. The ALJ found Baron's testimony was credible in some respects, but "her self-portrayal as an innocent victim of circumstance during the May 9, 2021 event," "downplaying her substantial disciplinary history, and further downplaying . . . her highly negative previous interactions with Heidi . . . problematic." The ALJ concluded that "Baron was not the victim of domestic violence or that Alfredo had ever been convicted of a domestic violence offense or disciplined by HCDOC." The ALJ found the only two instances of assault were perpetrated by Baron.

In finding Baron not guilty of violating N.J.A.C. 4A:2-2.3(a)(7), neglect of duty, the ALJ noted the altercation took place while Baron was off-duty and

14

was not related to her job responsibilities. The ALJ also determined Baron was not guilty of insubordination under N.J.A.C. 4A:2-2.3(a)(2) because the altercation was not related to her job, and she was not guilty of violating "other sufficient cause" under N.J.A.C. 4A:2-2.3(a)(12) because there were no alleged violations of HCDOC rules and regulations stated in the FNDA.

In addressing Baron's disciplinary record, the ALJ described it as "poor" and "troublesome," and emphasized that her two major disciplinary actions occurred within only four-and-a-half months of each other. The ALJ explained the May 9, 2021 incident alone would have resulted in her termination, but "when the second incident was added to the first one," it was the ALJ's "impression" that Baron's attorneys "kept the penalty to the ninety-nine days, rather than a longer suspension or termination." The ALJ concluded termination was appropriate based on "the relative severity of the offense" and Baron's "checkered disciplinary history and the short duration of [her] employment."

The CSC upheld the ALJ's decision sustaining the charge and decision to terminate Baron's employment given her disciplinary record. The CSC determined the ALJ's factual findings, credibility determinations, and legal conclusions were not arbitrary, capricious, or unreasonable, and the ALJ's application of progressive discipline principles was warranted. The CSC

15

accepted and adopted the ALJ's factual findings, legal conclusions, and penalty in a January 18, 2023 order. This appeal followed.

Baron raises the following arguments for our consideration:

> (1) despite the ALJ dismissing three of the four charges levied by the HCDOC against Baron, neither the ALJ nor the CSC took that fact into account when formulating the penalty in this matter;
>
> (2) the ALJ inappropriately speculated that Baron's prior major suspensions would have been worse had it not been for "good lawyering";
>
> (3) the ALJ improperly categorized this discipline as a third domestic incident instead of the first and only interaction between Baron and Heidi;
>
> (4) the testimony of the four witnesses the ALJ heard and considered was in equipoise;
>
> (5) the record showed in the prior face-to-face meetings between Baron and Heidi, there was never any physical contact;
>
> (6) Baron's prior discipline stemmed from altercations with Alfredo, not Heidi; and
>
> (7) the notion of progressive discipline is not served by imposing removal on Baron for the FDNA issued in this matter.

We reject these arguments and affirm.

16

## II.

Our role in reviewing the decision of an administrative agency is limited. In re Stallworth, 208 N.J. 182, 194 (2011). We accord a strong presumption of reasonableness to an agency's exercise of its statutorily delegated responsibility, City of Newark v. Nat. Res. Council in Dep't of Env't. Prot., 82 N.J. 530, 539 (1980), and defer to its fact finding, Utley v. Bd. of Rev., 194 N.J. 534, 551 (2008). We will not upset the determination of an administrative agency absent a showing that it was arbitrary, capricious, or unreasonable; that it lacked fair support in the evidence; or that it violated legislative policies. Lavezzi v. State, 219 N.J. 163, 171 (2014); Campbell v. Dep't of Civ. Serv., 39 N.J. 556, 562 (1963).

As particularly relevant here, our deference extends to the agency's choice of a disciplinary sanction. In re Herrmann, 192 N.J. 19, 28 (2007). "[W]hen reviewing administrative sanctions, 'the test . . . is "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness."'" Id. at 28-29 (quoting In re Polk, 90 N.J. 550, 578 (1982)).

A.

Baron argues her termination should be overturned, and she should be reinstated because the ALJ did not give proper weight to his finding that she was not guilty of violating three of the four charges. Baron contends neither the ALJ nor the CSC took the three "not guilty" findings into account when determining the penalty in this matter. The HCDOC argues the severity of Baron's conduct combined with her disciplinary record, supports the ALJ's decision to terminate and should be affirmed.

When imposing penalties, the CSC has long considered progressive discipline principles, which are based on the notion that "past misconduct can be a factor in the determination of the appropriate penalty for present misconduct." Herrmann, 192 N.J. at 29. The CSC has applied progressive discipline in two ways: (1) to "support the imposition of a more severe penalty for a public employee who engages in habitual misconduct," id. at 30; and (2) "to mitigate the penalty for a current offense," id. at 33. Progressive discipline, however, need not "be applied in every disciplinary setting." Ibid. Rather, progressive discipline may be bypassed "when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable

A-1546-22

for continuation in the position, or when application of the principle would be contrary to the public interest." Ibid.

When progressive discipline is applied, "an employee's past record with emphasis on the 'reasonably recent past' should be considered." Stallworth, 208 N.J. at 199 (quoting West New York v. Bock, 38 N.J. 500, 524 (1962)). "This includes consideration of the totality of the employee's work performance, including all prior infractions." Ibid. (emphasis omitted). "The number and remoteness or timing of the offenses and their comparative seriousness, together with an analysis of the present conduct, must inform the evaluation of the appropriate penalty." Ibid.

However, progressive discipline is not mandatory, and the ALJ can fashion a penalty without regard to the public employee's disciplinary history if they committed severe misconduct, acted in a manner that is "unbecoming" to their position or that "renders the[m] . . . unsuitable for continuation," or if applying progressive discipline "would be contrary to the public interest." Id. at 33; see also In re Carter, 191 N.J. 474, 484 (2007) (explaining that the application of progressive discipline is not "fixed and immutable" and that there are "some disciplinary infractions . . . so serious that removal is appropriate notwithstanding a largely unblemished prior record").

A-1546-22

On appeal, the court must ask "whether [the] punishment is 'so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness." Polk, 90 N.J. at 578 (quoting Pell v. Bd. of Ed., 313 N.E.2d 321, 326 (N.Y. 1974)).

Law enforcement officers are also held to a higher standard of conduct than other individuals because they are "held up as . . . model[s] of proper conduct." In re Emmons, 63 N.J. Super. 136 (App. Div. 1960). They "represent[] law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public." Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965). In disciplinary matters involving police and corrections officers, the court may consider public safety concerns. Carter, 191 N.J. at 485.

Against this backdrop, we are satisfied the CSC's imposition of termination was in accordance with the applicable law, supported by sufficient credible evidence, and was therefore neither arbitrary, capricious nor unreasonable. In re Phillips, 117 N.J. 567, 579 (1990). As noted, the ALJ categorized Baron's prior disciplinary violations as minor or major and determined her disciplinary record was "poor" and "her history is troublesome." Additionally, Baron had two significant suspensions only four and a half months

apart from each other, and the May 9, 2021 altercation occurred less than two years later.

The ALJ's determination was supported by evidence in the record. The ALJ considered the sustained infractions in tandem with Baron's ninety-seven-day suspension in 2018, and ninety-nine-day working suspension in 2019. The record therefore contained sufficient evidence for the ALJ to conclude Baron should be terminated.

Additionally, we are satisfied termination falls within the "continuum of reasonable outcomes," Henderson, 235 N.J. at 145, and is not "shocking to one's sense of fairness," Herrmann, 192 N.J. at 28-29 (quoting Polk, 90 N.J. at 578). The ALJ was not tasked with balancing the charges Baron was found not guilty of to determine her penalty. Rather, the ALJ's analysis focused on the type of offenses that Baron had been found guilty of in the past and the penalties assessed against her. We are satisfied the CSC's decision to terminate Baron was consistent with progressive discipline principles.

B.

Next, Baron argues the ALJ should not have speculated about the effect of her prior legal representation relative to her previous disciplinary record. Baron contends the ALJ improvidently gave the impression that she "ha[d]

21

already been cut a break . . . thereby eliminating the need to do her any favors stemming from this matter."

Here, the ALJ reasoned Baron's conduct was sufficiently egregious to warrant termination.  We conclude the ALJ's comment was simply dicta and does not invoke an erroneous interpretation of the law.  Melnyk v. Bd. of Educ. of Delsea Reg'l High Sch. Dist., 241 N.J. 31, 40 (2020).  Given our deferential standard of review, the record amply supports Baron's termination as the appropriate disciplinary penalty.

C.

Baron also argues the ALJ mischaracterized the subject altercation as another incident of her "assaulting [Alfredo] or his family member" and ignored the fact that she and Heidi had previously seen each other without fighting. Baron contends her prior disciplinary violations involved Alfredo, not Heidi, and the May 9, 2021 altercation should not be viewed as another domestic violence incident with Alfredo, but separately, as the first incident between Baron and Heidi.  We reject Baron's unsupported contention.

The record reflects the ALJ described Baron's conduct on May 9, 2021 as another assault on Alfredo or one of his family members.  However, the ALJ compared the May 9, 2021 altercation in relation to the rest of Baron's

22

disciplinary record and found "there were obviously some differences in the exact nature of the incidents." Therefore, Baron's assertion that the ALJ misconstrued the history and nature of altercations between Alfredo, Heidi, and Baron is entirely without merit.

D.

Baron asserts that even though she admitted to violating the conduct unbecoming a public employee regulation while off-duty, HCDOC failed to sustain its burden of proof on this charge because the witnesses' testimony was contradictory, and therefore, she should not have been found guilty of the charge. At best, Baron contends the evidence was in equipoise. Baron's argument is wholly without merit.

Conduct unbecoming a public employee is an "elastic" phrase that "has been defined as 'any conduct which adversely affects . . . moral[s] or efficiency of the [employer] [or] which has a tendency to destroy public respect for . . . employees and confidence in the operation of . . . services." Emmons, 63 N.J. Super. at 140 (quoting In re Zeber, 398 Pa. 35, 43 (Sup. Ct. 1959)). A public employee does not need to violate a specific departmental rule to violate N.J.A.C. 4A:2-2.3(a)(6). Phillips, 117 N.J. at 576. For example, in Hartmann v. Police Dep't of Ridgewood, we reasoned that if their conduct was proved on

remand, two police officers who were alleged to have rolled down an embankment while fighting, resulting in one officer discharging their personal firearm, could be guilty of conduct unbecoming a public employee. 258 N.J. Super. 32, 34-35, 39-40 (App. Div. 1992).

In this case, the ALJ had the opportunity to hear testimony and assess credibility. The CSC was "bound by the credibility determinations of the ALJ unless arbitrary, capricious, or unreasonable." Klusaritz v. Cape May Cnty., 387 N.J. Super. 305, 315 (App. Div. 2006). Significantly, Baron has not identified any credibility determinations or findings of fact of the ALJ as arbitrary, capricious, or unreasonable.

The ALJ determined Baron showed up at Elizabeth's home on the day in question and was the "instigator" and "the primary 'bad actor'" of the altercation, telling the twins to chant "Daddy's a liar," insulting Heidi, making inappropriate comments to her, making sordid comments to Heidi's and Alfredo's sons, and refusing to leave. The ALJ observed Elizabeth's testimony was "straightforward and believable," and that Alfredo was not credible because of his "demeanor and reluctance to answer questions" and his minimizing prior issues with Baron. Overall, the ALJ found Heidi's testimony was credible but was undermined by her disingenuous testimony about the recording. And, the ALJ provided

24

background for how his assessment of credibility of Baron's testimony affected his conclusion, noting "her self-portrayal as an innocent victim of circumstance," downplaying her substantial disciplinary history, and "her highly negative previous interactions with Heidi." The ALJ emphasized that both Elizabeth and Heidi's versions of events confirmed Baron refused to leave when asked, and she started the fight. The evidence therefore was not in equipoise and fully supported the ALJ's determination that Baron was guilty of conduct unbecoming a public employee.

To the extent we have not specifically discussed any remaining arguments raised by Baron, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1546-22